[No. A055103. First Dist., Div. Three. Oct. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD S. LYONS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V, and VI of the Discussion.

**COUNSEL**

Howard J. Specter, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Morris Beatus and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

WHITE, P. J.—Richard S. Lyons appeals from a judgment of conviction based upon a jury finding him guilty of oral copulation, sodomy, kidnapping, as well as two counts of attempted manslaughter and three counts of auto theft. (Pen. Code, §§ 288a, subd. (c); 286, subd. (c); 207, subd. (a); 664/192; Veh. Code, § 10851.) Defendant also pled guilty to being a felon with a firearm. (Pen. Code, § 12021, subd. (a).) For the reasons stated below we reverse one count of attempted manslaughter and remand the case for resentencing.

## FACTS

At noontime on October 27, 1990, Andrea S., a prostitute, was at 18th and Mission Streets in San Francisco waiting for a bus. A light blue van pulled up and stopped in front of her. The driver, whom Andrea identified as defendant, asked whether Andrea was working. When Andrea gave a negative response, he offered to drive her to where she was going. Andrea accepted.

Andrea entered the van and sat on the bench seat behind the driver, since there was no passenger seat in front. She engaged in some small talk for a while, then looked up and saw defendant pointing a gun at her. Andrea begged defendant to put the gun away; she promised to do anything he wanted so long as he did not hurt her.

Defendant directed Andrea to sit in the front area where the passenger seat was missing. He continued to drive while pointing the gun at Andrea's head. He eventually stopped the van at 6th and 16th Streets. Still holding the gun, defendant took his penis from his pants and ordered Andrea to orally copulate him. She did so for an undetermined period of time until he ejaculated.

Defendant reached for Andrea's bag and asked where the money was. Andrea replied there was none, since she was not working. Defendant then ordered Andrea to stand up and get out of her clothes. She complied by taking off her body suit, skirt and pantyhose. Defendant ordered Andrea to lie on her stomach. With the gun still at her head, he sodomized her. When defendant was finished, he told Andrea to put on her clothes, opened the door of the van and told her to get out and walk.

At 9 a.m. on November 11, 1990, Cirice B., a prostitute in the Mission District, was standing at 15th and Mission Streets. A light blue van pulled up and the driver, identified as defendant, said, "Hey girl, come on and make some money." Cirice got into the van which had no front passenger seat. Defendant said he would give Cirice $20 for a blow job. Cirice suggested they go to a parking lot of a restaurant located around the corner, but defendant said that he preferred another location. Cirice agreed, believing that he would be more comfortable in the location of his choice.

Defendant drove to an industrial area. He gave Cirice $20 and she orally copulated him. Defendant then offered an additional $10 for sexual intercourse. Cirice took the money, and removed one stocking to facilitate intercourse.

After defendant ejaculated, he inquired about the price for an act of sodomy. Cirice refused to perform the act. Visibly angered, defendant reached in a credenza, pulled out a gun and pointed it at Cirice. Cirice opened the passenger door and fled from the van. As she was running, Cirice heard defendant shooting at her. One of the bullets hit Cirice's right leg. Defendant drove away, taking Cirice's leather coat, purse and shoes. Cirice subsequently identified defendant as her assailant from a photo lineup.

The transcript of Mina B's testimony at the preliminary hearing was read to the jury. Mina stated that in the early morning hours of November 16, 1990, she was at Market and 7th Streets when a blue van began following her. As she started to cross Market Street, the driver of the van, identified as defendant, grabbed her arm and pulled her into the van. Defendant said they were going to Daly City and have some fun.

When they arrived at defendant's house in Daly City, defendant told Mina to get undressed. Defendant then said he had to go outside to the van. When he left, he locked all the doors from the outside so Mina could not escape. When defendant returned, he undressed and lay on the floor with a pipe of cocaine. He ordered Mina to orally copulate him and she complied. Defendant then told Mina to lie on her stomach. Defendant "started having sex with [Mina] from the back." Defendant suggested taking a shower and again having intercourse. Although defendant and Mina showered, they did not have sex again since defendant decided to go and get drugs from his friend. Mina announced she would accompany him. Defendant told Mina to leave some clothes at the house.

Defendant drove the van back to San Francisco. He then told Mina he had missed the turn where his friend stayed. Defendant stopped the van in a back alley. Defendant started hitting Mina in the face and chest, demanding that she give him her money. After stating she had no money, Mina looked through her purse for anything she could give defendant. In her purse she found her knife. She turned around with the knife and defendant shot her. Mina started stabbing defendant, since he had shot her in the chest. Defendant then shot Mina a second time. Mina screamed for help and defendant hit her and told her to shut up. He said he was going to leave her there "just like the bitches." He said, "[a]nd that's when they find your body, you be dead." Defendant finally pulled Mina out of the van; he told her he was leaving her body for dead.

Charles Haff, a night watchman at a warehouse on 6th Street, heard two gunshots about 12:15 a.m. on November 16, 1990. When he went to investigate, he noticed a blue van start up and leave. A short time later, Haff

discovered Mina lying underneath the stairs of the warehouse. She was bleeding from the chest and told Haff she had been shot.

The van which defendant was driving had been spotted by police on November 13, 1990. It was parked underneath the Route 280 extension at 4th and Berry Streets in a parking lot. Surveillance of the vehicle was set up but discontinued after nobody went near the vehicle. However, surveillance was resumed after report of Mina's shooting. At approximately 6 a.m. the van pulled into the lot. Defendant was driving and was placed under arrest.

The blue van was owned by I. Magnin, which used it to shuttle employees and guests between locations from 7 a.m. to 7 p.m. on weekdays. Defendant had worked as a shuttle driver at I. Magnin from May through August of 1990. He was not working for the company in October or November; nor had he permission to drive the van at that time.

Defendant testified on his own defense. He admitted taking the I. Magnin van without permission; he needed some sort of transportation when he was dealing with prostitutes. He stated he first saw Andrea on Capp and 17th Streets. He asked her if she was working and she said yes. He asked the price for oral sex and she told him $20. Andrea got into the van and they drove to 6th and 16th Streets. Defendant was not satisfied after Andrea had orally copulated him and he offered her an additional $10 for anal sex. Although Andrea initially agreed, she began to protest during the act; she said defendant was too big, he was making her sore and she was entitled to an additional $20. Defendant refused to pay the additional fee. Disgruntled, Andrea left the van and said he "hadn't heard the last of her." Defendant denied he had ever used a gun to threaten Andrea.

Defendant stated he picked up Cirice in the same general area where he first met Andrea. When she agreed to provide oral sex for $20 he drove her to 6th and 16th Streets. The oral sex was unsatisfactory, and he inquired about anal sex. Cirice declined and they agreed to an act of regular sex for an additional $10. Defendant changed his mind when he smelled an unpleasant odor and saw something white and dried around Cirice's vaginal area. Defendant asked for a partial refund, since they had not completed the act. Cirice refused. Defendant stepped outside the van to urinate. When he looked over his shoulder, he saw Cirice put her hand into his black bag on the dashboard of the van. The bag contained a pistol for his protection when he went with prostitutes. Defendant reached into the van and tried to grab the bag from her hand. Cirice withdrew her hand with bills of currency. She opened the passenger door and ran. Defendant got the pistol from his bag, shot into the ground and told her to stop. Cirice kept running. Defendant did not know Cirice had been hit.

Defendant decided to find prostitutes in a different area. He met Mina in the Tenderloin district. They talked for a while, agreed to have sex and she got into his van. Defendant drove to his apartment in Daly City. On the way, Mina started smoking crack cocaine which made defendant feel sick. Defendant asked her to stop. At his apartment, defendant fixed Mina a glass of brandy. He went outside to get cigarettes from the van. When he returned, Mina was again smoking cocaine. Defendant asked her to put it away. After he took a shower, Mina orally copulated defendant.

About midnight, defendant drove Mina to San Francisco. On the way defendant suggested Mina orally copulate him for another $10. Mina agreed. As they exited the freeway, Mina started smoking cocaine again. Irritated, defendant slapped the pipe out of Mina's hand. Mina started to curse and stabbed defendant. Defendant stopped the van and attempted to grab the knife. Mina lunged at defendant a second time. Defendant then pulled his pistol from his pocket and fired two shots; the first shot was toward the door in order to get her to drop the knife, the second was in self-defense.

Defendant presented evidence to prove his apartment doors could not be locked from the outside. He also presented evidence that Mina and Cirice had been convicted of felonies.

DISCUSSION

## I. *Mina's Testimony*

The trial court granted defendant's motion to disqualify Mina as a witness pursuant to Evidence Code section 701,[1] on the ground she was incapable of appreciating her duty to tell the truth. However, over defendant's objection, Mina's preliminary hearing testimony was admitted pursuant to section 1291, since Mina was unavailable as a witness. Defendant contends Mina was also incompetent at the time of the preliminary hearing, and admission of her testimony constituted prejudicial error.

Defendant's claim of error is based on the fact that at the preliminary hearing Mina testified that one of the sexual acts that occurred in defendant's apartment consisted of defendant penetrating her in one of her "three holes." Mina claimed to have a third orifice between her vagina and anus. It was stipulated that Mina did not have a third orifice.

---

[1]Evidence Code section 701, subdivision (a) provides: "A person is disqualified to be a witness if he or she is: [¶] . . . [¶] (2) Incapable of understanding the duty of a witness to tell the truth."

All further statutory references are to the Evidence Code unless otherwise indicated.

At the preliminary hearing Mina also admitted she had told the police defendant had murdered her first husband, Bennie Foster, and he had assaulted her for testifying against him in court. By the time of the preliminary hearing, she thought it was defendant's father who had killed her husband. It was stipulated that defendant had never been charged with the murder of Bennie Foster and there never had been a trial concerning the death of Bennie Foster.

In addition, at the preliminary hearing Mina stated defendant had killed her second husband, Darryl Harrison, by blowing up the airplane on which he was flying. At the pretrial hearing Mina was no longer certain this had happened.

During cross-examination at the preliminary hearing, Mina could not remember certain events on November 16. Defense counsel asked if she was on medication and Mina stated she was taking Dilantin. Counsel objected to Mina's competence based on her ability to recall. The magistrate found that with the exception of an occasional lapse of memory, Mina had a fair recollection of what had occurred.

During an in camera hearing at trial, it was revealed that Mina might suffer from a multiple personality syndrome; there is a Mina personality which is docile and noncombative and there is a Nina personality which is very combative and hostile.

After Mina was declared incompetent to testify at trial, the prosecutor moved to introduce her preliminary hearing testimony. The court initially denied the motion, reasoning that the magistrate at the preliminary hearing had ruled on Mina's ability to remember events while under medication, not on her ability to distinguish the truth. The court noted that after reading the preliminary hearing transcript, it appeared Mina was incompetent while she was testifying. It also observed it was unclear whether Mina had been testifying as Mina or Nina. Finally, with reference to Mina's testimony regarding her third orifice, the court stated: "How can she understand the duty to tell the truth when that's so inherently unbelievable?" However, the court later reversed itself and admitted the preliminary hearing testimony. The court expressly stated it was following the holding in *People* v. *Liddicoat* (1981) 120 Cal.App.3d 512 [174 Cal.Rptr. 649].

In *Liddicoat*, a four-year-old victim was ruled incompetent at trial because she was incapable of understanding the duty of a witness to tell the truth pursuant to section 701, subdivision (b). The prosecutor then offered into evidence the transcript of the child's testimony at the preliminary hearing,

during which the magistrate had ruled the child was competent. The defendant argued that the trial court should reweigh the evidence relevant to qualification in the preliminary examination transcript and should make its independent determination. The trial court deferred to the magistrate's ruling, finding it was supported by sufficient evidence.

On appeal, the court held the victim's preliminary hearing testimony was subject to an objection at trial pursuant to section 1291, subdivision (b).[2] (*People* v. *Liddicoat, supra,* 120 Cal.App.3d at p. 514.) The court further held the trial court's deference to the magistrate's ruling was proper, since the trial court found the magistrate's ruling was supported by substantial evidence. (*Id.,* at p. 516.)

*Liddicoat* may be easily distinguished from the case at bench. While the magistrate in *Liddicoat* was ruling on the basis of section 701, the magistrate in this case based his ruling on section 702.[3] That is, defendant's objection to Mina's "competence" at the preliminary hearing was on the basis of her ability to remember what had occurred, not on her capacity to understand the duty to tell the truth. Thus, on the issue of Mina's ability to tell the truth, there was no ruling made by the magistrate.

The People concede defendant made no section 701 objection at the preliminary hearing, and maintain the issue was consequently waived. ██ However, this court, like the Supreme Court, believes that where the examination of a record indicates a witness is incompetent, it is manifestly unfair to affirm a conviction merely because his counsel failed to make the proper objection. (See *People* v. *Burton* (1961) 55 Cal.2d 328, 341 [11 Cal.Rptr. 65, 359 P.2d 433].)

It is clear from Mina's preliminary hearing testimony that the witness was delusional and unable to distinguish truth from lies at the time of the preliminary hearing. The Attorney General admits the testimony was "both contradictory and fantastic." It was error to admit the testimony at trial. Moreover, the error was prejudicial. If the preliminary hearing transcript had not been admitted, there would have been no prima facie evidence of

---

[2]Section 1291, subdivison (b) provides: "The admissibility of former testimony under this section is subject to the same limitations and objections as though the declarant were testifying at the hearing, except that former testimony offered under this section is not subject to: [¶] (1) Objections to the form of the question which were not made at the time the former testimony was given. [¶] (2) Objections based on competency or privilege which did not exist at the time the former testimony was given."

[3]Section 702, subdivision (a) provides: "Subject to Section 801, the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."

attempted voluntary manslaughter.[4] Accordingly, the error requires reversal of count XV.

II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The conviction for count XV is reversed. The remaining convictions are affirmed. The cause is remanded for resentencing consistent with the views expressed in the nonpublished portion of this opinion.

Merrill, J., and Werdegar, J., concurred.

---

[4]The jury found defendant not guilty of all charges based on crimes against Mina except count XV. Count XV charged defendant with attempted murder. The jury found him guilty of the lesser included offense of attempted voluntary manslaughter.

*See footnote, *ante*, page 837.