Filed 10/22/14  P. v. Price CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHERYL LYNN PRICE,<br><br>Defendant and Appellant. | F065516<br><br>(Super. Ct. No. VCF232931)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo and Brett R. Alldredge, Judges.[†]

Linda J. Zachritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[†]     Judge Saucedo presided over defendant's trial; Judge Alldredge sentenced defendant.

**INTRODUCTION**

After a jury trial, defendant Cheryl Lynn Price was convicted as charged of count 1, felony assault with a deadly weapon on Matthew Chavez (Matthew) (Pen. Code,[1] § 245, subd. (a)(1)); and count 2, misdemeanor resisting a peace officer, Officer Ryan Park (§ 148, subd. (a)(1)), with special allegations for one prior serious felony enhancement (§ 667, subd. (a)), and one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  She was sentenced to the aggregate second strike term of nine years.

On appeal, defendant contends the court improperly permitted the victim of count 1, Matthew, to testify without conducting a hearing to determine whether he was competent as a witness.  Defendant also contends the court erroneously overruled her objections that 11-year-old Daniel, who was present during the assault and testified for the prosecution, was not competent to be a witness.  We will affirm.

## FACTS

In November 2009, Patsy Chavez (Chavez) lived in a two-story apartment in Visalia with her 25-year old son Matthew, his girlfriend Nicole (Nicole), and their two young children.[2]  Chavez and Nicole testified Matthew was diagnosed as mentally retarded and had the mind of a nine- or 10-year-old child.  At that time, defendant had lived with Chavez's family for about two months.  They met defendant through her former boyfriend, who "dump[ed]" her near their house when she was ill and suffered a seizure.  Chavez called an ambulance and defendant was taken to the hospital.  When defendant was released, she appeared at Chavez's house and did not have any place to go.  Chavez decided defendant could stay with her family because she was sick, unable to

---

[1]     All further statutory citations are to the Penal Code unless otherwise indicated.

[2]     For the sake of clarity, we will refer to some of the parties by their first names given the similar last names; no disrespect is intended.

care for herself, and in "desperate" need of help. Defendant slept on the living room couch.

Chavez testified defendant suffered from diabetes, and Chavez helped monitor her blood sugar levels. Defendant often displayed unusual behavior. She would yell, moan, and groan as if she was in pain or distress. Defendant frequently had seizures and would be unresponsive, and Chavez regularly called paramedics to take care of her.

**The argument**

On the evening of November 23, 2009, Matthew told Chavez something was going on outside their apartment that involved defendant. Chavez went outside but she did not see anything. When defendant returned, Chavez decided not to talk to her about whatever happened until the next day.[3]

On November 24, 2009, Chavez tried to talk to defendant about what happened the previous night. Defendant denied anything happened and said it was not true. Chavez testified defendant "got crazy," and called Matthew "'a rat'" and other names. Defendant became louder and more aggressive, and yelled at everyone in the apartment.

Chavez testified that when she spoke to defendant that day, defendant did not display the same type of unusual behavior that she had often showed on previous occasions. Instead, Chavez characterized defendant's behavior as "normal" for that day.

Chavez testified that as they continued to argue, defendant pulled out her cell phone and appeared to call an unknown person. Defendant told that person that she was going to bring other people to get involved and protect her. Defendant also told that person to "bring a gun because she's going to get ready to blow up some people" and "blow some people away." Nicole testified she heard defendant tell someone on the cell

---

[3]    During pretrial motions, the prosecutor made an offer of proof that Matthew told Chavez he saw defendant having sex with a man who might have been a sex offender. The court granted defendant's motion to exclude this evidence because it was unduly prejudicial.

phone that "she wanted to get a gun because she wanted to shoot up people" who were "in the house."

When Chavez heard defendant's threats about the gun, she firmly told defendant that enough was enough and it was time for her to leave. Defendant yelled that she was not leaving. Chavez told Matthew and Nicole to take their children upstairs and call 911. Chavez was concerned things might get out of hand.

Sophia and her nine-year-old son Daniel were visiting Chavez's house that day. Sophia testified she heard Chavez and defendant argue. Chavez told defendant to leave and defendant refused. Sophia described defendant as very angry, upset, loud, and aggressive. Sophia testified she heard defendant say something about a gun. Sophia took Daniel outside when she heard defendant talk about a gun.

**Defendant pulls the knife**

Nicole and Matthew took the children upstairs, and Chavez stayed downstairs with defendant. Defendant went into the kitchen, and Matthew started to return downstairs. Chavez testified that Matthew shouted, "'Mom, she's got a knife in her hand.'" Defendant was about six to eight feet away from Chavez, and Matthew stepped between them.

In the meantime, Sophia and Daniel were standing outside by the open front door. Sophia testified defendant and Matthew faced each other in the front hallway. They were about two or three feet apart. Defendant was yelling, and waving and moving her hands at Matthew. Matthew had his hands in front of him as if to block defendant. Matthew yelled something upstairs to Nicole. Defendant went into the kitchen and Matthew followed her.

**The 911 calls**

At some point during this incident, defendant called 911. She yelled at the operator, used profanities, and falsely claimed she had a rental agreement and Chavez

4.

was trying to throw her out. The operator told defendant to calm down and the police were on the way.

Nicole was still upstairs and decided to call 911 because Sophia shouted "there was a knife," and Chavez yelled defendant had already called 911.

At 5:45 p.m., Nicole called 911 and reported defendant had a knife in her hand and she was pointing it "right at us." Nicole told the operator defendant was trying to "call the cops herself, trying to lie about everything." The operator said her partner was on the other line with defendant, and asked Nicole where defendant was. Nicole said defendant was in the kitchen. The operator said that everyone should stay away from defendant until the police arrived. Nicole testified her statements to the 911 operator were based on what the others shouted from downstairs.

**The police arrive**

At 5:46 p.m., Visalia Police Officer Michael Carsten heard the dispatch and responded to Chavez's house within two minutes. Carsten walked up to the front door and heard a woman yelling profanities. He looked through the adjacent kitchen window and saw defendant holding a large, 12-inch kitchen knife in her right hand. Defendant walked toward the window, then stopped and turned away. Defendant continued to yell, but Carsten heard the knife fall into the kitchen sink.

Carsten was invited into the house, went into the kitchen, and spoke with defendant. She was not holding a knife. Carsten asked her to sit down and she complied.

Officer Ryan Park arrived and found defendant sitting at the kitchen table with Carsten. Park asked defendant for her name and she identified herself. Defendant started to yell and scream at him.

Park and Carsten spoke to the other occupants, and then attempted to place defendant in handcuffs. Park grabbed defendant's right arm and told her to place her hands behind her back. Defendant stiffened her right arm, refused to comply, and

5.

continued to yell at the officers. Defendant repeatedly ignored the officers' orders to cooperate. Park and Carsten pulled defendant from the chair to the floor. Defendant resisted and yelled at them. The officers had to forcibly place her in handcuffs.

Park placed defendant in the police car and did not ask her any questions. After she was in the car, defendant volunteered that "she came home with a pie, and that she went into the residence and asked [Nicole] for a knife and a fork so she could eat her pie because she felt that her blood sugar was low due to her diabetes. And that [Nicole] didn't get her one so she went to the kitchen and got her own fork and knife."[4]

Park did not call an ambulance to Chavez's house because defendant did not appear to be in an emergency medical condition. When defendant told Park she had diabetes, Park took defendant to the emergency room consistent with the department's protocol on such matters. While they were in the hospital's waiting room, defendant continued to yell and scream. Park asked her to be quiet because of the other patients. Defendant said she did not care. The hospital staff advised Park that defendant would require extended treatment for her diabetes.

**The witnesses' statements**

Officer Carmen Landin arrived at Chavez's house after defendant had been taken from the scene, and separately interviewed the witnesses.[5] Landin testified Chavez was nervous and stressed out. Her eyes were watery as if holding back tears. Chavez said she saw defendant with a knife, defendant grabbed it from the kitchen, and she was swinging her arms and tried to stab Matthew with it.

---

[4] Nicole testified she never saw defendant trying to eat a pie or anything else during the incident. Park testified he never saw a pie, but admitted his attention had been focused on defendant's behavior.

[5] Landin testified after Chavez, Sophia, and Daniel appeared at trial, as to their prior inconsistent statements.

Landin testified Sophia was also very upset. Sophia said she saw defendant with a knife, and she lunged at Matthew with it.[6] Landin separately spoke to Daniel. Landin was able to communicate with Daniel and understand his responses. Daniel was "shaken" and very nervous. Daniel said he saw defendant with a knife that came from a "box," and showed Landin what he meant. Daniel led her to a knife stand on the kitchen counter. Daniel said he saw defendant grab the knife, and she said "really bad words" to Matthew. Daniel would not repeat those words to Landin. Daniel said he was afraid Matthew was going to get hurt.

**Matthew's trial testimony**

Matthew was called as a prosecution witness and testified he recognized defendant, but he could not remember if defendant visited or lived with his family. Matthew remembered an incident happened at his house when the police were called. He did not remember why the police were there, or whether he had been in an argument or fight with defendant. After this brief testimony, the prosecutor excused Matthew subject to recall.[7]

A few days after his initial trial appearance, the court granted the prosecutor's motion to recall Matthew. During his second appearance, Matthew testified he was nervous when he initially testified but he was more comfortable this time. Matthew

---

[6]     At trial, Sophia testified that she did not recall telling the police that she saw defendant with a knife. Sophia claimed she never saw a knife, and only heard there was a knife. When asked to review her previous statement to the police, Sophia admitted it was possible she told the officers that she saw defendant with a knife and defendant lunged at Matthew with the knife, or she might have heard someone say it happened.

[7]     As we will discuss in issue I, *post*, when Matthew initially took the stand, defense counsel moved for the court to conduct a hearing as to whether he was competent to be a witness, based on Chavez's testimony that he had the mind of a nine- or 10-year-old child. The court denied the motion and did not conduct a hearing as to whether Matthew was competent to be a witness. Defendant challenges this ruling on appeal, and contends Matthew should not have been allowed to testify.

testified that after his first appearance, he spoke to the prosecutor and investigator, and told them things he had not remembered when he was in court.

Matthew testified defendant never stayed at his house but she just came by. He remembered when the police asked him questions about what happened when defendant was at his house. Sophia and Daniel were also there that day, but Matthew did not know where they were during the incident.

The prosecutor asked Matthew to explain what happened.[8] Matthew testified: "I just came downstairs and with my mom and that's what—she came out with a knife," indicating defendant. "Yeah, I was coming downstairs … and I was protecting my mom, and that's when she came at us with a knife."

Matthew testified defendant was in the kitchen and his mother was in the hallway. "I just seen her have a knife in her hand and that's when she started coming towards us, so I was protecting me and my mom." The prosecutor asked Matthew to describe the scene, and whether he knew his left from this right. Matthew said he did. Matthew demonstrated that defendant held the knife in her right hand, with her arm bent at the elbow and raised toward her head. Defendant was facing Chavez when she held the knife.

Matthew testified defendant did not say anything and "[s]he just had the knife and she was trying to go at us with that."

"Q.    How was she trying to go at you guys?

"A.    Just get the knife and come out with it, attack me and my mom."

Matthew explained he "just got in front of my mom and that's when the knife started coming towards us." "When she was coming towards us with the knife, I was stepping back with my mom. I didn't want anything to happen to her." Matthew testified

---

[8]    We are quoting Matthew's trial testimony at length, given defendant's contention that Matthew was not competaint to be a witness.

defendant was "power walking" towards them.  Matthew backed away because he did not want to be hurt.  Chavez was behind him.  Defendant continued to walk towards them, and her arm was still raised with the knife.

The prosecutor asked Matthew to describe the knife.  Matthew gestured with his hands that it was eight to 10 inches long.  Matthew testified he had seen the knife before in the kitchen drawers.  Matthew used the landmarks in the courtroom to indicate defendant came within four to five feet of them.  Matthew testified the police arrived and tackled defendant, and she was violent towards the officers.

**Daniel's trial testimony**

Daniel, who was 11 years old at the time of trial, testified he knew Chavez, Matthew, and Nicole, and he had been to their house lots of times.[9]  Daniel recognized defendant because he had seen her at Chavez's house.  He was at Chavez's house on the day of the incident to play with Matthew's children.

Daniel testified he was in the house with his mother.  His mother told him to go outside and they stood near the front door.  Daniel climbed a tree, fell down, and then looked through the kitchen window and saw defendant and Matthew fighting.

Daniel testified defendant was in the kitchen.  Nicole took her children upstairs because defendant and Matthew were fighting.  Daniel heard someone, who might have been Chavez, loudly yell "knife" as if she was scared.

On direct examination, the court permitted the victim witness advocate to read Daniel's previous statement to him to refresh his recollection, because Daniel testified he did not know how to read "that much."  After hearing the statement, Daniel remembered telling the police that he saw defendant "pu[ll] the knife out."  Daniel gestured with his

---

**9**     As we will explain in issue II, *post*, the court conducted an evidentiary hearing and found Daniel was competent to be a witness, and overruled defendant's objections to his testimony. Defendant contends the court should have excluded Daniel's testimony because he was not competent to testify.

fingers that the knife was about 10 to 12 inches long. Daniel demonstrated defendant held the knife in her right hand, above her head, with her arm bent at the elbow.

Daniel testified defendant acted like she was going to stab Matthew. Matthew was "[n]ot that close" to defendant when she had the knife. When asked to demonstrate the distance, Daniel gestured to an object in the courtroom that was about five feet away. Daniel testified defendant moved the knife around, and Matthew moved from side to side. The knife "looked like it was real and [she was] going to stab Matthew."

**DEFENSE EVIDENCE**

Ted Pistoresi owned and operated an ambulance service in Madera County, and also worked as a paramedic. His company had responded to over 300 calls for defendant. He personally responded to at least 10 calls for defendant. His company did not treat defendant when she lived with Chavez in Visalia. Most of the calls were for defendant's diabetic complications when she was hypoglycemic with low blood sugar. She would be disoriented or unconscious. Her blood sugar would be so low that often it could not be measured.

Pistoresi testified that on some occasions when he responded, defendant was staring into space, walking around dazed and confused, unconscious, or screaming and yelling. She would be irrational and say things that did not make sense. Defendant appeared angry and aggressive when her blood sugar was not at the right level. She calmed down and became more rational after Pistoresi gave her food or orange juice to restore her blood sugar level.

Dr. Pratap Narayan was the medical director of the Fresno County Department of Health and supervised medical services at the Fresno County Jail. He testified generally about diabetes. If left uncontrolled, diabetes may result in prolonged hyperglycemia from excess glucose, which will cause cognitive impairment, mood problems, anxiety, aggression, depression, bad language, temper tantrums, and memory problems. In contrast, hypoglycemia results when the person's blood-sugar levels are too low. The

10.

symptoms include confusion, delirium, or an inability to make meaningful sense of what the person sees or hears. The person may become anxious, agitated, or depressed.

Deshawn Carrington testified he met defendant after the November 2009 incident at Chavez's house. Defendant lived with Carrington for four months in 2010. Carrington testified defendant would become confused and loud when her blood sugar became too low. It was impossible to tell her anything because she could not understand what was going on. Carrington called an ambulance two or three times when defendant became disoriented because she was screaming and rolling around on the floor.

## I.     The court did not abuse its discretion when it declined to conduct a hearing on Matthew's competency.

Defendant contends the court improperly denied her motion to conduct a hearing to determine if Matthew was competent to testify. Defendant argues that the court should have conducted such a hearing when he was initially called as a witness, based on Chavez's testimony about Matthew's cognitive limitations. Defendant further argues such a motion would have been granted, and he would not have been recalled as a witness. Defendant argues the court's error was prejudicial because Chavez, Nicole, and Sophia were unable to testify at trial that they saw defendant holding a knife. Defendant asserts Matthew's second trial appearance, when he described defendant's assault with the knife, was likely influenced by speaking with his family, and there is no evidence he understood the duty to tell the truth.

Defendant's contentions require a review of the circumstances of Matthew's two appearances at trial.

### A.     Matthew's initial appearance

Chavez was the first prosecution witness and testified Matthew had the mind of a nine- or 10-year-old child. When Matthew was called as a witness, defense counsel objected outside the jury's presence to his competency based on Chavez's statements about Matthew's limitations. Defense counsel stated Matthew showed physical evidence

11.

of his mental impairment, but did not describe that evidence on the record. Defense counsel asked the court to conduct a hearing on Matthew's competency to testify.

The court denied the motion, it did not conduct a hearing on Matthew's competence to testify, and stated it would reconsider defendant's request if his competence became an issue based on his ability to answer questions.

Matthew resumed his testimony before the jury and said he recognized defendant. Mathew could not remember if defendant had visited or lived at his house. Matthew remembered that an incident happened at his house and the police were called. He did not remember why the police were there, or whether he had been in an argument or fight with defendant. Matthew was excused subject to recall.

After Matthew was excused, a juror sent a note to the court and asked if Matthew was cognitively impaired, what was his full-scale intelligence quotient, and whether he was a client of Central Valley Regional Center. The court declined to answer the questions given Matthew's limited testimony.

When Nicole testified for the prosecution, she was asked about Matthew's cognitive abilities. Nicole testified Matthew had been diagnosed as mentally retarded and he received government assistance.

### B.    The prosecutor's motion to recall Matthew

A few days after Matthew's first appearance, the prosecutor advised the court and defense counsel that he was going to recall Matthew as a witness based on the following circumstances. The prosecutor and investigator had conducted a tape-recorded interview with Matthew after his initial testimony, and provided a copy to defense counsel. During that interview, Matthew said it had been very difficult for him to be in court and see defendant. Matthew said he had been very nervous and had a hard time remembering what happened. When he spoke to the investigator, however, he was able to remember the incident with defendant and the knife.

12.

Defense counsel objected to recalling Matthew, and argued the prosecutor already had an opportunity to refresh Matthew's recollection when he testified. Counsel argued Matthew could not be recalled after being interviewed with leading questions, or having the opportunity to speak to his family after his initial appearance. Counsel did not renew his objections to Matthew's competency as a witness.

The prosecutor clarified that Matthew's family was not present and did not speak to him during the investigator's interview. The prosecutor argued defense counsel's objections went to the weight rather than the admissibility of recalling a prosecution witness.

The court held the prosecutor could recall Matthew because he had not been excused as a witness.

### C.      Matthew's second trial appearance

When Matthew was recalled as a witness, he testified before the jury that he remembered being in court before. He had been nervous to be a witness the first time, but he was more comfortable this time. Matthew testified he later spoke to the prosecutor and investigator, and told them things that he had not remembered when he was in court.

Matthew testified about how defendant assaulted them with the knife, as set forth in the factual statement above. At the conclusion of his direct examination, the following exchange occurred:

"[The prosecutor]. Did anyone tell you what you should say as a witness?

"A.      No.

"Q.      Did I ever tell you that you should say anything in particular as a witness in this case?  [¶] … [¶]

"[A.]  Yes.

"Q.      What did I tell you to say?

"A.      To tell the truth.

13.

"Q. Okay. Is what you're telling us today the truth?

"A. Yes, sir."

On cross-examination, defense counsel extensively questioned Matthew about his inability to remember anything when he initially testified. Matthew admitted he previously testified he could not remember anything about the incident, and said that was the truth at that time. Matthew testified he no longer had any trouble remembering what happened.

**D.     Analysis**

Defendant contends the court should have granted her motion to conduct a hearing on Matthew's competency when he first testified, based on Chavez's testimony that he had the mind of a nine- or 10-year-old child and Matthew's physical appearance at trial. Defendant further contends that when Matthew was recalled as a witness and testified about the assault, there was no evidence he understood the duty to tell the truth when he recounted the incident given his initial testimony that he could not remember fighting with defendant.

"As a general rule, 'every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' (Evid. Code, § 700; see Pen. Code, § 1321.) A person may be disqualified as a witness for one of two reasons: (1) the witness is incapable of expressing himself or herself so as to be understood, or (2) the witness is incapable of understanding the duty to tell the truth. (Evid. Code, § 701, subd. (a).)" (*People v. Mincey* (1992) 2 Cal.4th 408, 444.)

A defendant must raise the claim of testimonial incompetence at trial or the issue is forfeited. (*People v. Cudjo* (1993) 6 Cal.4th 585, 621-622.) The question of a witness's competency to testify is a preliminary fact to be determined exclusively by the court. The party challenging the witness bears the burden of proving disqualification, and a trial court's determination will be upheld in the absence of a clear abuse of

14.

discretion. (*People v. Anderson* (2001) 25 Cal.4th 543, 573; *People v. Mincey*, *supra*, 2 Cal.4th at p. 444.)

While defendant preserved the issue of Matthew's competence, she contends the court abused its discretion when it refused to conduct an evidentiary hearing based on her initial objection. However, defendant demanded an evidentiary hearing simply on the basis of Chavez's testimony that Matthew, who was 27 years old at the time of trial, had the mind of a nine- or 10-year-old child, and defense counsel's declaration that he displayed physical evidence of mental impairment, although counsel did not clarify the nature of that physical evidence.

In any event, "[t]he fact that a witness may have suffered from mental disorders does not by itself support the claim that he is incapable of communicating so as to be understood" or otherwise is not competent to be a witness. (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1071-1072.) While Nicole later testified that Matthew had been diagnosed as mentally retarded, and the court had the discretion to conduct an evidentiary hearing, the evidence regarding Matthew's abilities did not automatically undermine his competence as a witness. (*People v. Lewis* (2001) 26 Cal.4th 334, 360-361 [witness suffered mental disorders, difficult to understand, and had intellect of seven year old child]; *People v. Gipson*, *supra*, at p. 1072 [witness suffered mental delusions]; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1324, 1328-1329 [minor was "'moderately'" mentally retarded]; *In re S.C.* (2006) 138 Cal.App.4th 396, 421 [developmentally disabled minor]; *People v. Augustin* (2003) 112 Cal.App.4th 444, 448-449 [witness with cerebral palsy and difficult to understand].)

The court did not summarily deny defendant's motion for an evidentiary hearing on Matthew's competence, but instead stated it would address the matter if his competence became an issue as he testified. Matthew's brief appearance showed his ability to express himself and did not raise any questions about his competency.

When Matthew was recalled as a witness, defendant did not renew her objections to his competency, but questioned whether Matthew had been influenced by his family or the investigator in the period of time between his two appearances. At that point, defendant's concerns addressed Matthew's personal knowledge to testify, a matter separate and apart from competency. A witness must have personal knowledge of the subject of his or her testimony based on the capacity to perceive and recollect. The capacity to perceive and recollect is a condition for the admission of a witness's testimony on a certain matter. It is subsumed within the issue of personal knowledge, and it is not a prerequisite for the witness's competency. (*People v. Anderson*, *supra*, 25 Cal.4th at p. 573; *People v. Dennis* (1998) 17 Cal.4th 468, 525.)

> "'[T]he court may exclude the testimony of a witness for lack of personal knowledge *only if no jury could reasonably find* that he has such knowledge. [Citation.] Thus, the Evidence Code has made a person's capacity to perceive and to recollect a condition for the admission of his testimony concerning a particular matter instead of a condition of his competency to be a witness. And, under the Evidence Code*, if there is evidence that the witness has those capacities*, the determination whether he in fact perceived and does recollect is left to the trier of fact. [Citation.]' [Citations.]" (*People v. Anderson*, *supra*, 25 Cal.4th at pp. 573-574.)

In this case, Matthew's claimed inability to remember in his first appearance, and the inconsistencies in his accounts between his two trial appearances, did not raise concerns that he was not competent to testify. "[C]ontradictory testimony does not suffice to show incapacity to understand the duty of truth, or to express oneself coherently." (*People v. Avila* (2006) 38 Cal.4th 491, 589.) Moreover, the jury was aware of Matthew's cognitive limitations, based on the testimony of Chavez and Nicole. The jury was also aware of the circumstances surrounding his two trial appearances—that he had been unable to remember anything when he initially testified, he was uncomfortable facing defendant in court, he later spoke to the investigator and remembered the incident, and he offered a fairly cogent account of the assault when he was recalled as a witness.

16.

Defense counsel extensively cross-examined Matthew's second account and raised the possibility that his belated recollections were influenced by his family. These issues were relevant to Matthew's credibility and not to his competency, and they were adequately disclosed to the jury so as to allow it to determine his credibility. (*People v. Lewis*, *supra*, 26 Cal.4th at p. 356; *People v. Mincey*, *supra*, 2 Cal.4th at pp. 444-445; *People v. Gipson*, *supra*, 117 Cal.App.4th at pp. 1071-1072.)

Defendant argues that while Matthew's second trial appearance might have demonstrated his ability to express himself, there was still no evidence that he understood the duty to tell the truth since he initially testified that he could not remember the incident, but later offered a detailed account of defendant's actions. "[A]n actual direct threat of punishment for not telling the truth is not a prerequisite for a trial court's determination that a person is competent to be a witness." (*People v. Mincey*, *supra*, 2 Cal.4th at p. 444.)

The test for competency is not whether the witness is testifying truthfully, but whether the witness has the capacity to understand his duty to testify truthfully. (*In re Crystal J.* (1990) 218 Cal.App.3d 596, 602.) For example, in *People v. Lyons* (1992) 10 Cal.App.4th 837, the court held one of the victims in a sexual assault case was not competent to testify. *Lyons* held the trial court should have excluded her testimony because she was so delusional, and her testimony so contradictory and fantastic, that she lacked the ability to understand the duty to testify truthfully. The witness's testimony included claims that the defendant sexually assaulted her in an imaginary part of her body, he murdered two of her husbands, and he blew up a plane on which her husband was flying. There was also evidence the witness suffered from multiple personality disorder, and the trial court had been unable to determine which of the different personalities was testifying. (*Id*. at pp. 842-844.)

There is no evidence that Matthew was delusional or described imaginary events. Matthew's admitted inability to remember the assault during his first appearance did not

17.

mean he was not competent to be a witness. (See, e.g., *People v. Lewis*, *supra*, 26 Cal.4th at p. 360.) During his second appearance, Matthew extensively testified about the assault. He did not offer "yes" or "no" responses to leading questions. Instead, he independently described in detail how defendant threatened them with the knife, and how he tried to block her advances. He admitted when he did not know something, such as where Sophia and Daniel were during the assault. He might have been confused or offered inconsistent testimony about some details, but those matters raised questions for the jury as to his credibility. "Inconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. [Citation.] They present questions of credibility for resolution by the trier of fact. [Citations.]" (*People v. Mincey*, *supra*, 2 Cal.4th at pp. 444-445.) "[T]he witness's answers on the whole were lucid and responsive, and nothing in his testimony reveals either an inability to distinguish truth from falsehood (or perception from imagination) or a failure to appreciate his obligation as a witness to tell the truth. We are satisfied that the process of examination and cross-examination gave the jury an adequate basis on which to evaluate the truth of the witness's testimony.…" (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 622.)

The court could have reconsidered Matthew's competence after he was recalled to testify. It was aware of defendant's concerns and denied her initial request for a hearing because it wanted to evaluate Matthew's ability to testify. By that time, however, it was evident that Matthew was competent to testify. (*People v. Ayala* (2000) 23 Cal.4th 225, 264-265.) The court did not abuse its discretion when it declined to conduct a hearing on Matthew's competence as a witness. (*People v. Augustin*, *supra*, 112 Cal.App.4th at pp. 448-449.) More importantly, there is no substantial basis in the record to demonstrate Matthew was not competent. (See, e.g., *People v. Lewis*, *supra*, 26 Cal.4th at p. 360.)

Defendant asserts the court's erroneous admission of Matthew's testimony was prejudicial because there was no other direct evidence that defendant was holding a knife or assaulted Matthew with it. Defendant points to the trial testimony of Chavez, Nicole,

and Sophia, who failed to testify in court that they saw defendant holding a knife: Chavez testified she heard Matthew say that defendant had a knife; Nicole testified she was upstairs and heard Sophia call out that defendant had a knife; Sophia testified she was standing outside the open front door and testified she did not see defendant with a knife.

Even if Matthew's testimony should have been excluded, the court properly admitted the testimony of Officer Landin, who offered evidence of the prior inconsistent statements from Chavez and Sophia, that they saw defendant assault Matthew with the knife. Officer Park also saw defendant with the knife when he initially arrived at the house. Thus, defendant's assertion that the erroneous admission of Matthew's testimony was prejudicial lacks merit.

## II.     The court properly admitted Daniel's testimony

In contrast to Matthew, the court conducted a hearing on whether 11-year-old Daniel was competent to testify. The court overruled defendant's objections and found he was competent. Defendant contends the court abused its discretion and Daniel's testimony should have been excluded. Defendant argues the court's alleged error was prejudicial because of the absence of direct evidence that defendant pulled a knife on Matthew.

Our review of the evidentiary hearing reflects the court did not abuse its discretion when it allowed Daniel to testify.

### A.      The evidentiary hearing for Daniel

After Sophia testified, the prosecutor advised the court that he was going to call Sophia's son, Daniel. The court replied that it would conduct an evidentiary hearing to determine Daniel's competence as a witness.

During the evidentiary hearing, the court asked Daniel several questions about school. Daniel testified he was 11 years old, he was in the fifth grade, and he went to Conyer School. He played games, and did homework and math in school.

19.

The court asked Daniel what year it was. Daniel said he did not know. The court asked Daniel to count back one year from the year 2012. Daniel counted back to 2011, 2010, and 2009. The court asked Daniel how old he was in 2009. Daniel said he did not remember. The court asked Daniel for his age. Daniel said he was 11 years old. The court asked how old he was three years ago in 2009. Daniel thought he might have been 10 years old.

The court asked Daniel if he knew the days of the week. Daniel said no, "[t]hey didn't teach me that." The court asked if he knew the months of the year. Daniel shook his head no. The court asked what month it was. Daniel replied, "2012."

The court pointed out a woman who was sitting in the courtroom, and asked Daniel what her hair color was. Daniel said it was gray. The court asked if it would be right or wrong to say her hair was yellow. Daniel said he did not know. The court asked Daniel if it was right or wrong to say the prosecutor's tie was blue. Daniel said it was wrong because his tie was "almost like her hair color."

The court clarified the record: "[B]oth of those are light colored .… I'm familiar with the person who's in the audience and her hair is light, it's a blondish color. And [the prosecutor's] tie is a light color, it's a yellowish green color .…" Defense counsel replied that the woman's hair was not gray.

The court asked Daniel to say something that was true, and something that was a lie. Daniel said it was true that his dog scratched him, and showed the scratches. Daniel said it was not true that his shoes were not tied, and showed that he did not have laces on his shoes. The court agreed the statement was not true because his shoes did not have laces.

The prosecutor asked Daniel what the color of his pen was. Daniel said it was blue.

"Q. If I told you that this pen is pink, would that be the truth or a lie?

"A. A lie.

20.

"Q.   Why?

"A.   Because it's not pink, it's blue.

"Q.   What grade are you in?

"A.   Fifth grade.

"Q.   If I told the judge that you are actually in sixth grade, would that be true.

"A.   No.

"Q.   Why not?

"A.   Because I'm not in sixth grade."

Defense counsel asked Daniel if the prosecutor had already asked him about the color of his pen before the hearing. Daniel said yes. Counsel asked if the prosecutor also went over the questions what grade he was in. Daniel said he might have forgotten because he fell off the "monkey bars a long time ago." Counsel asked Daniel if he had problems remembering things because he fell off the monkey bars. Daniel said maybe.

Defense counsel showed Daniel a red toy car and asked what color it was. Daniel said red.

"Q.   If I told you that that toy car was yellow, would that be a truth or a lie?

"A.   Lie.

"Q.   Do you know what a knife is?

"A.   (Nods head.)

"Q.   What's a knife?

"A.   To cut up food and vegetables.

"Q.   What does a knife look like?

"A.   It's sharp. It has a sharp end on top."

Defense counsel asked Daniel what he did the prior weekend and last Christmas. Daniel said he could not remember "because I fell off the monkey bars."

"Q.   And so you fell off the monkey bars. That means you have trouble remembering stuff?

21.

"A.    (Nods head.)

"Q.    Is it hard for you to remember a lot of things?

"A.    Because—because a lot of stuff is in my head.

"Q.    What stuff is in your head?

"A.    Math and everything with school, and science."

At the conclusion of the hearing, the court asked for an offer of proof of Daniel's proposed testimony. The prosecutor replied Daniel told the police he saw defendant grab a big knife, and she looked like she was going to stab Matthew.

The prosecutor argued Daniel was competent as a witness because he was likely to remember a volatile and traumatic event like defendant's assault with a knife, compared to a random period of time like the previous weekend. Daniel showed he understood the difference between the truth and a lie, he was able to count, and he knew colors and what he was doing in school. He only had problems when asked about subjects he did not know about or understand.

The court asked whether Daniel had any developmental disabilities. The prosecutor stated that according to Daniel's mother, he had attention deficit hyperactivity disorder. Matthew's girlfriend, Nicole, told the prosecutor that Daniel was hyper and had a hard time sitting still. The prosecutor was not aware of any actual cognitive impairment. Daniel attended a regular school, he was in the fifth grade, and he was able to do basic subtraction when asked. The prosecutor argued that a witness did not have to be proficient in advanced math or know the months of the year to be competent as a witness.

Defense counsel objected to Daniel's competency. Counsel argued the boy's inability to know days, months, and hair colors showed a lack of understanding of basic facts which impeded communication and understanding, and prevented effective, direct

22.

or cross-examination. There was no evidence Daniel understood the duty to tell the truth or remembered the incident in question.

> "How do we know he's effectively communicating about what he saw if he can't communicate effectively about basic things. We're not asking him advanced calculus. We're not asking him basic calculus. We're asking him the most rudimentary questions and he's incapable—he's a sweet kid, but—sweet child, I should say—but he's incapable of expressing basic information."

Defense counsel asked the court to further question Daniel if it was inclined to let him testify, to ensure that thoughts had not been "put into the child's head which are not there actually."

The prosecutor replied that when the court initially questioned Daniel, the bailiffs were escorting custodial inmates out of the courtroom, and they were 15 to 20 feet away from Daniel. When Daniel was asked about the woman's hair color, she was sitting 30 to 40 feet away, in the rear portion of the courtroom that was dimly lit compared to the witness stand. The woman's hair was dyed, which left the color ambiguous.

## B. The court's ruling

The court held Daniel was competent to testify and overruled defendant's objections.

> "[T]he first area of inquiry is whether he could communicate, whether he could express himself in any fashion that could be effective, because any witness must be able to communicate, and that is, to be able to tell whatever they need to tell.

> "Part of my inquiry was just to determine whether the child had sufficient language and communication skills to be able to express what happened. So that was the first area of my inquiry.

> "The second was to try to understand whether he understands the duty to tell the truth, and that's why I inquired about things that were obvious to the Court—color of hair, different matters here in the courtroom. So my inquiry from this witness was basically two-fold, and that is, to address the issue of communication and then also to understand the duty to tell the truth.

23.

"And at this point I am going to permit the witness to testify. I do find he is competent to testify under [Evidence Code sections] 700, 701, and I will take up evidentiary objections at the time that his testimony is raised in court."

At a later point in the trial, just before Daniel was called to testify, the prosecutor advised the court that he asked the victim advocate about Daniel. The victim advocate reported that according to Daniel's mother, Daniel had Asperger's syndrome, which the victim advocate described as a "mild form of autism."

The court replied the information did not change its ruling that Daniel was competent to testify because he was able to express himself, and understood the difference between the truth and a lie and that he was required to tell the truth on the stand.

## C.      Daniel's trial testimony

When Daniel testified in front of the jury, he said he had never been in court and he was nervous. Daniel testified no one told him what to say except to tell the truth. The prosecutor asked Daniel if he knew what it meant when he promised to tell the truth. Daniel said yes, and he would not tell any lies.

As set forth above, Daniel testified that he saw defendant with the knife. Daniel also testified he could not read "that much." Daniel knew he talked to the police but he did not know when that happened. The court permitted the victim witness advocate to read Daniel's previous statement to the police to him to refresh his recollection.

On cross-examination, Daniel testified he had problems remembering everything because he hit his head on the monkey bars last Christmas. He received special help at school with his homework. When asked if he was sure what happened between Matthew and defendant, Daniel said no because he fell off the monkey bars. Daniel agreed with defense counsel's question that some of the things he previously told the police, and remembered in court, were from what he heard other people say about the incident. Daniel testified that after the police took defendant away, he heard Chavez, Matthew,

24.

Nicole, and his mother talk about what happened. However, Daniel testified he looked through the window and saw them fighting.

### D.    Analysis

As we have already explained, in general, every person, irrespective of age, is qualified to be a witness. "A person may be disqualified as a witness for one of two reasons: (1) the witness is incapable of expressing himself or herself so as to be understood, or (2) the witness is incapable of understanding the duty to tell the truth. (Evid. Code, § 701, subd. (a).)" (*People v. Mincey*, *supra*, 2 Cal.4th at p. 444.) Defendant preserved the objection to Daniel's competency, the court conducted an evidentiary hearing on the issue, and defendant had the burden of showing Daniel was not competent to testify. The court overruled defendant's objections and found Daniel was competent, and the ruling is reviewed for an abuse of discretion. (*People v. Anderson*, *supra*, 25 Cal.4th at p. 573.)

As we also explained above, a witness who suffers from a cognitive impairment is not automatically rendered incompetent to testify. The fact that Daniel may have a form of Asperger's syndrome and/or attention deficit disorder did not render him incompetent as a witness.

As for the results of the evidentiary hearing, "[i]t is not unheard of for a four year old to qualify as a witness. (E.g., *In re Katrina L.* (1988) 200 Cal.App.3d 1288, 1292 & fn. 1, 1299 [rejecting argument that four-year-old witness was incompetent].) It is not unusual for five year olds to qualify as witnesses. (*People v. Mincey, supra,* 2 Cal.4th at pp. 443-445 [trial court did not abuse its discretion by finding five-year-old witness competent to testify]; *Adamson v. Department of Social Services* (1988) 207 Cal.App.3d 14, 19-20 [same]; *People v. Thompson* (1959) 167 Cal.App.2d 727, 735 [no error to find five year old competent where she was exceptionally bright for age]; *People v. Smith* (1958) 162 Cal.App.2d 66, 67, 69.)" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1368-1369.) "Testimonial competence may vary greatly given an individual child's

25.

abilities. Some four-year-old children are precocious and verbal, while many have limited language and cognitive abilities. Whether a child is competent to testify may also depend upon the nature of the testimony sought to be elicited. While a young child may have difficulty expressing complex or abstract thoughts, such a child may well be able to relate uncomplicated, simple facts." (*Id*. at p. 1369. fn. omitted.)

At the evidentiary hearing, Daniel was 11 years old and clearly able to speak and communicate about topics he knew and understood—his age, grade, school, and school subjects. He was also able to communicate about the topics he did not understand—he struggled with some of the court's questions; he said that he did not know the day, month, or year; and he did not know how to subtract to determine his age in a particular year. He also struggled when asked about the color of the woman's hair and the attorney's tie.

Defendant argues Daniel's difficulties in these areas showed he was incapable of expressing himself to be understood, and to be subject to cross-examination about whether he was telling the truth based on what he claimed to have perceived. To the contrary, Daniel admitted his confusion and inability to respond to certain questions, such as what he did the previous weekend. Daniel was more certain when asked about specific topics. Daniel easily responded to the prosecutor's simple questions about knowing the difference between telling the truth and a lie. Daniel offered a more complex response to the court's request to say something that was not true—that his shoes were not tied, and he showed that he did not have laces on his shoes. More dramatically, Daniel immediately responded without hesitation when asked whether he knew what a knife was: it was something with "a sharp end on top" and it was used to "cut up food and vegetables."

In resolving this issue, we may also review the entirety of Daniel's trial testimony. (See, e.g., *People v. Smith*, *supra*, 162 Cal.App.2d at p. 69.) Daniel was clearly able to express himself about the dramatic incident he observed when defendant assaulted Matthew with a knife. His testimony was consistent with one of the undisputed facts,

that Sophia took Daniel outside as the conflict became heated.  Daniel's testimony was also inconsistent and confusing in some aspects, and he admitted on cross-examination that he heard everyone talking about the incident after it happened.  As with Matthew's testimony, however, these issues presented credibility questions for the jury, and did not undermine Daniel's competence to testify.  (See, e.g., *People v. Mincey*, *supra*, 2 Cal.4th at pp. 444-445.)  Given the entirety of the record, the trial court did not abuse its discretion when it found Daniel was competent to testify.

### **DISPOSITION**

The judgment is affirmed.


_____

Kane, J.

WE CONCUR:


_____

Levy, Acting P.J.


_____

Detjen, J.