Filed 3/18/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>RICARDO GIRON-CHAMUL,<br><br>     Defendant and Appellant. | A140628<br><br>(Solano County<br>Super. Ct. No. FCR288598) |

Ricardo Giron-Chamul was charged with one count of sexual intercourse with a child aged 10 years or younger, one count of sexual penetration of a child aged 10 years or younger, and one count of oral copulation with a child aged 10 years or younger, based on accusations made by his four-year-old daughter (daughter).[1] A jury convicted Giron-Chamul of the oral-copulation count and acquitted him of the other two counts, and he was sentenced to a term of 15 years to life in prison.

On appeal, Giron-Chamul claims that (1) he was denied his right to a speedy trial; (2) insufficient evidence supports his conviction; (3) the testimony of daughter, who was five years old at the time of trial, should have been excluded because she was not competent to testify; and (4) he was deprived of his constitutional right to confrontation. We reject the first three arguments but agree with the last. We hold that Giron-Chamul was denied an opportunity to effectively cross-examine daughter because she did not answer hundreds of questions posed by his trial counsel, including approximately 150 that sought substantial information on important issues. We also conclude that Giron-

---

[1] The counts were brought under Penal Code section 288.7, subdivisions (a) (sexual intercourse) and (b) (sexual penetration and oral copulation). All further statutory references are to the Penal Code unless otherwise noted.

Chamul was prejudiced by daughter's refusal to answer these questions, and we therefore reverse his conviction.[2]

I.
FACTS

*A.     The Initial Report.*

Giron-Chamul married K.S., daughter's mother, in September 2005, and daughter was born in December 2006.  The couple separated in January 2010, after Giron-Chamul, who was a master sergeant in the United States Air Force during the events in question, returned from a deployment.  After the separation, daughter stayed with Giron-Chamul at his home in Fairfield every other weekend.  K.S. believed daughter and Giron-Chamul, whom daughter called "Papi,"[3] had "a close relationship," and she trusted him with daughter.  K.S. testified that she had an "amicable" relationship with Giron-Chamul "at most times" after they separated, although they were involved in an active divorce case in the fall of 2011.

Daughter returned from a visit with Giron-Chamul on Sunday, September 4, 2011, a few months before she turned five years old.  The following Thursday, Giron-Chamul called K.S.'s home and had a brief conversation with daughter.  Later that night, K.S. was getting daughter ready for bed, a routine that included applying ointment to daughter's vagina to treat occasional rashes.  K.S. testified that daughter "grabbed her labia," "moved it as if it were talking," and said in a "playful . . . but . . . rougher tone of voice,"

---

[2] In light of our disposition, we need not consider Giron-Chamul's remaining claims that daughter's forensic interview should not have been admitted at the preliminary hearing or at trial, daughter's testimony through closed-circuit television did not comply with constitutional or statutory requirements, and daughter's mother made improper comments at the sentencing hearing.

[3] Daughter's name for Giron-Chamul is transcribed as "Poppy" throughout the record. We believe it is more likely that daughter, who spoke both English and Spanish, called him "Papi"—a Spanish term for father—and use that spelling instead.

2

" 'I'm going to eat you.' "[4]  K.S. asked daughter, "Where did you learn that?"[5]  Daughter responded, " 'My [papi].' "[6]

K.S. asked daughter if Giron-Chamul had done anything else to her.  Daughter "slapped [her groin] with her hand cupped," explaining that Giron-Chamul " 'goes like this' " and denying that she meant he had slapped her own hand when she tried to touch herself.  Daughter also told her mother that Giron-Chamul had pinched her and demonstrated by pinching a stuffed bear in its "groin area."  Daughter became "an[ts]y" as she talked to K.S., and K.S. stopped questioning her and put her to bed.

The next day, K.S. took daughter to the small daycare she had been attending since she was two years old.  K.S. told the daycare provider that daughter had reported that "somebody had touched her," and she asked the daycare provider to try to elicit more information from daughter.  The daycare provider testified that K.S. said daughter "was grabbing her vagina" the night before and had tied the action to "her [papi]."

After K.S. left, the daycare provider asked daughter if "somebody [did] something to [her] 'pompi al frente,' " which the daycare provider testified meant daughter's

---

[4] A police officer testified that K.S. reported to him that daughter said, " 'Eat me,' " not "I'm going to eat you."

[5] K.S. testified that there was no pornography in the house when she lived with Giron-Chamul, daughter never saw her parents having sexual intercourse or oral sex, and K.S. had never told daughter about the mechanics of those acts.  Similarly, Giron-Chamul's girlfriend, whom he began dating in October 2010 and with whom he was still involved at the time of trial, testified that Giron-Chamul did not have pornography in his home, that she had a normal sexual relationship with him, and that daughter had never been present when they had sexual intercourse or oral sex.

[6] K.S.'s testimony about daughter's statements was admitted under the fresh-complaint doctrine, which permits the admission of "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault . . . for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.)  The jury was instructed that it could consider K.S.'s testimony about daughter's statements "for the purpose of corroborating [daughter]'s testimony, but not to prove the occurrence of the crime."

"private in the front," or to her " 'pompi del atras,' " which meant her bottom. Daughter responded, "Yes, my [papi]," and attempted to demonstrate by "pick[ing] up her dress and pull[ing] down her pants" before the daycare provider stopped her.[7] In response to further questions, daughter said she had told Giron-Chamul to stop and claimed that "[Papi's] amigos," who were in the room at the time, also told him to stop. Daughter mentioned "her best friend Jessie" was present as well.[8] Daughter also said Giron-Chamul would touch her when she was taking a bath and "he would be sneaky."

The daycare provider then took daughter to the daycare's play room. Without prompting, daughter grabbed a baby doll and squeezed its "vaginal area." She then licked her index finger, "put it on her forehead and then on her hand, . . . and then on her other hand and then on her vagina," and made a "sizzling sound."[9] The daycare provider immediately called K.S. to tell her she believed daughter should see a doctor and then made a report to Child Protective Services.

The daycare provider had daughter sit with some of the other children while waiting for K.S. to arrive and gave the children paper so they could draw. Daughter drew a face next to three short vertical lines, two large circles underneath the face, and another set of three longer vertical lines touching the bottom of one of the circles. Daughter explained to the daycare provider that the drawing, which was admitted at trial, depicted daughter's "sad face because . . . she didn't like it." The circles depicted daughter's

---

[7] The daycare provider's testimony about daughter's statements was also admitted under the fresh-complaint doctrine, and the jury received the same instruction about that testimony as it did about K.S.'s testimony.

[8] K.S. testified that she "assumed [Jessie] was a little girl [daughter] used to play with." On the other hand, Giron-Chamul's girlfriend was nicknamed "Jessie," and she had contact with daughter several times while dating Giron-Chamul. Daughter testified on cross-examination that "Jessie is a big girl from [Papi's] house, but . . . her house is far away."

[9] A co-worker who appeared as a character witness on Giron-Chamul's behalf testified that at a children's birthday party in May 2010, he saw daughter "running around playing like a young girl would, and she was . . . taking her finger and like looking at [Giron-Chamul] and kissing the finger, and 'Z-Z-Z-Z[,]' . . . touching her leg on the side in a playful manner." The action "appeared to be . . . a kind of game, . . . [a] playful action."

4

"bottom," and referring to the sets of vertical lines, daughter "specified that the small tongue was her tongue, and that the big tongue was [Papi's] tongue when [Papi] was licking her bottom."

K.S. picked daughter up and took her to a hospital later that morning. A physical exam of daughter's external genitalia revealed "no bruising, no bleeding, no redness, no swelling," nor any other indications that daughter had been hurt, and daughter denied experiencing any pain. K.S. made a police report later that night, and she soon obtained a restraining order in family court preventing Giron-Chamul from having contact with her or daughter.[10]

B.     *The Forensic Interview and Sexual-assault Examination.*

A trained police technician employed by the Fairfield Police Department conducted a forensic interview of daughter in mid-October 2011, about five weeks after her initial report, and a video recording of the interview was played for the jury. At the interview's outset, daughter was able to answer questions about her name, age, and address, but she did not exhibit a clear understanding of the difference between the truth and a lie when the interviewer asked her about that concept.[11]

Using anatomical diagrams, daughter indicated that she used the term "colita" for both vagina and penis and the term "booty" for bottom. The interviewer said she had heard that daughter "told [her] mommy . . . something about [her] colita" and asked her what it was. After licking her index finger and placing it on her lower back while making

---

[10] Giron-Chamul testified that K.S. called him in late October 2011, and he hung up on her after telling her that he was not supposed to talk to her because of the restraining order. His attorney in the divorce case testified that he told Giron-Chamul that K.S. was likely making a "pretext phone call" in an attempt to get him to admit he had molested daughter. The prosecution introduced evidence that a cell phone seized from Giron-Chamul had been used to search for the term " 'pretext phone call' " and to visit websites involving the use of " 'pretext phone calls in sexual-assault investigations,' " but no other relevant evidence was discovered on the phone or on any of the three computers also seized from him.

[11] We need not consider the ramifications of this failure to demonstrate an understanding of the difference between the truth and a lie because we do not reach Giron-Chamul's claims involving daughter's truth competency during the forensic interview.

5

a sizzling sound, daughter stated, "[M]y dad do it like this." Daughter then stated, "He touched my colita." When the interviewer asked daughter what her father "touched it with," daughter pointed to her vagina and said, "He touched with . . . a lengua," which means "tongue" in Spanish. She said, "He can't stop . . . [¶] [c]ause he's so crazy" and "he [did] it again like a hundred times."

Daughter then lay back in her chair, spread her legs in the air, and touched her vagina, saying that it "was red and . . . it was night. . . . [¶] And [Giron-Chamul] was cleaning it. And it's . . . red." Daughter indicated he had licked his finger and touched her vagina as well as her "butt." When asked what her father said when he touched her "butt," she said, "He says yes to me and I say no to him." She also said that "he said[,] 'I'm sorry,' " because "he like me, because he's my best friend." She could not provide clear or consistent answers about where or when the touching had occurred.

The interviewer then gave daughter a glass, explaining that the exterior was "outside of [daughter's] colita" and the interior was "inside [daughter's] colita," and a pen, explaining it was "daddy's finger," and asked daughter to demonstrate how Giron-Chamul touched her vagina. Daughter put the pen straight into the glass and then made a stirring motion around the inside rim. She agreed with the interviewer that her father "moved his finger around" inside her vagina.

The interviewer showed daughter the male anatomical diagram and asked, "Now can you show me any other parts of daddy's that he touched your colita with?" Daughter indicated that Giron-Chamul had touched her with his "colita" and drew a line from the penis on the male diagram to the vagina on the female diagram. It had happened at Giron-Chamul's house on her "big bed," and he took a bath afterward because "[h]e was smelling dirty." Daughter denied, however, "see[ing] anything come out of daddy's colita." Daughter stated her father "said sorry" and "said he [was her] best friend."

The interviewer asked daughter whether Giron-Chamul "touched [her with] any other parts of his body." Daughter pointed to the mouth on the male anatomical diagram. Initially, she said she did not know what part of her own body Giron-Chamul had touched with his mouth, but then she indicated that it was on her "boobs."

6

Finally, the interviewer showed daughter the picture she had drawn at the daycare provider's house. Daughter explained that it depicted Giron-Chamul "laying back" and herself, and she also stated that both tongues were his. She said a few times that she did not know what he was doing with his tongue and then said he "licked the food" at Burger King. In response to more direct questioning, however, daughter stated that Giron-Chamul's tongue was on her "booty" in the drawing. After being asked "[w]hat else . . . he [did] with his tongue . . . on [her] body," daughter made a back-and-forth motion with a pen over the vagina on the female anatomical diagram. The interviewer then wrote "touched colita with tongue" on that diagram.

After the forensic interview ended, a sexual-assault nurse examiner examined daughter. The nurse testified that daughter was "calm and cooperative" during the examination. An internal and external examination of daughter's genitalia did not reveal any "indications of trauma," any indication her hymen had ever been penetrated, or anything else unusual. The nurse testified that children's hymens are particularly sensitive and that "touching the hymen of a four[-]year[-]old [would be] very painful" for the child. But she also testified that it was possible to insert something in a child's labia without reaching the hymen, and it was possible for the hymen to be injured and heal to appear normal again.

### C. Daughter's Testimony.

Daughter was five years and two months old at the time of trial. Her trial testimony lasted for about four hours, spread over three days, and it was videotaped. We have carefully reviewed the recordings, which are far more revealing than the transcript, and describe daughter's testimony in detail because our ultimate disposition of this appeal turns on the nature and frequency of the attorneys' questions and the extent of daughter's selective responsiveness.

#### 1. The competency hearing.

Before the jury was sworn, the trial court held a hearing under Evidence Code section 402 to determine whether daughter was competent to testify. The prosecutor had to carry daughter, who was crying, to the witness stand. According to the prosecutor,

daughter repeatedly said on her way to the stand that she was "scared" of her father, who was present in court and was also crying, and that she did not want him to look at her. The prosecutor attempted to question daughter, but she hid behind a chair, and the court granted the prosecutor's request to recess.

After the break, the trial court held a hearing on whether daughter should be permitted to testify by closed-circuit television, which is authorized in the case of a young child who would otherwise be unavailable as a witness because of the negative impact of being in the defendant's presence. (§ 1347, subd. (b).) The prosecutor argued that the section 1347 procedure was appropriate based on daughter's behavior in court earlier that morning. Over Giron-Chamul's objection, the court ruled that daughter could testify by closed-circuit television.

The competency hearing was held by closed-circuit television a few days later.[12] Daughter, who testified from a jury deliberation room, answered almost all of Giron-Chamul's trial counsel's questions, although she got out of her chair and had to be repeatedly asked to return. After daughter struggled to answer counsel's more abstract questions about the meaning of truth and lies, the trial court permitted the prosecutor to take over the questioning.

Although daughter's attention wandered throughout the prosecutor's examination, she again responded to most of the questions asked. Daughter accurately indicated whether statements about clothes worn by the prosecutor and daughter's victim advocate, who was in the room with daughter, were "real" or "not real." The prosecutor was also able to elicit daughter's testimony that it is bad to lie, that daughter would only tell the truth and "things that are real" in court, and that K.S. punished her if she lied and was happy if she told the truth.

When defense counsel began questioning daughter on redirect, she quickly lost interest and got out of her chair again, prompting a recess. After the hearing resumed, daughter refused to answer any more questions, climbed under the room's conference

---

[12] No video recording of the competency hearing is included in the record.

8

table, and would not come out. The trial court ended the hearing and ruled that she was a competent witness.

### 2. Procedure for testifying by closed-circuit television.

Daughter's trial testimony was also given by closed-circuit television. Her victim advocate, a bailiff who was not in uniform, and a camera technician were in the jury deliberation room with her. Daughter had a chair next to the victim advocate's at the conference table, behind which was a large whiteboard. Giron-Chamul, the attorneys, the trial court, and the jury remained in the courtroom.

Consistent with section 1347, daughter's testimony was recorded.[13] Our record contains video recordings from three different cameras.[14] One camera in the deliberation room was focused on daughter and transmitted her image to the courtroom. When, as often occurred, she would leave her chair and either walk around the room or go under the table, the technician used this camera to track her movements so that those in the courtroom could see what she was doing. A second camera in the deliberation room remained fixed on daughter's and the victim advocate's chairs from a different angle. Finally, a third camera recorded an image of the courtroom that was transmitted to a monitor on the conference table. The image permitted daughter to see both counsel's tables, the attorneys, and Giron-Chamul, but not the trial court or the jury.

### 3. Direct examination.

Daughter's direct examination began relatively smoothly. Daughter often spun around in her chair or lay across the conference table to look at the monitor, but she

---

[13] After an issue arose about K.S.'s interaction with daughter in the deliberation room during breaks, the trial court ordered that the breaks be recorded as well.

[14] In ruling on Giron-Chamul's motion for a new trial, the trial court stated, "[T]here is a distinct difference between the visual viewing of [daughter] on DVD's versus reading what she said in a transcript. [¶] I do believe that it is important for anyone who is looking at this case to view the DVD's. There were a number of physical motions and gestures that [daughter] made and her body language spoke volumes regarding how she was reacting as she was being questioned by the attorneys in this case, and the transcript does not do justice to her testimony." We wholeheartedly agree with the court's assessment and have closely reviewed the relevant portions of the recordings before us.

9

answered the prosecutor's questions about topics like her name and birthday. She also successfully answered questions that demonstrated her ability to distinguish between the truth and a lie.

Less than 10 minutes into her testimony, however, daughter disappeared under the table after testifying that she called her bottom her "butt" and her vagina her "colita." She was coaxed back into her chair a couple minutes later, and the prosecutor showed her the drawing she had made at the daycare provider's house. Daughter identified the drawing and explained that it was "[o]f [herself] and [Papi's] butt and his tongue and his other tongue up and down." She then said it was "[herself] and [her] butt and [Papi's] tongue," but she quickly became reluctant to continue discussing the drawing and went under the table again. Daughter repeatedly refused to come out, and the trial court granted the prosecutor's request for a recess.

After the break, the prosecutor asked more questions about the drawing. Within seconds, daughter again disappeared under the table. She could not be convinced to get back in her chair until the prosecutor promised they would "talk about something else." The prosecutor then asked a few questions about a dog daughter had seen at the prosecutor's office when she came there for the forensic interview, but daughter did not answer and went back under the table. After she refused to come out, the trial court granted the prosecutor's request to break early for lunch.

After lunch, the prosecutor asked daughter several times what the drawing depicted before daughter finally agreed that it was "a picture of [her] butt and of [Papi's] tongue." When the prosecutor asked daughter "what [her papi] did with his tongue on [her] butt," daughter disappeared under the table again and failed to respond. She soon emerged and began walking around the room, not answering the prosecutor's repeated questions about what her father had done to her.

After being unable to elicit any further testimony from daughter about the drawing's significance, the prosecutor asked a few questions about the dog, to which daughter responded by nodding even though she was urged to give verbal answers. When the prosecutor began asking about the forensic interview, daughter did not respond

10

at all. There was a brief sidebar, after which the prosecutor asked daughter some questions about the daycare. Daughter buried her face in the back of her chair, refused to respond, and went back under the table.

The prosecutor then spent several minutes asking daughter about the dog, a doll the victim advocate had given her, which she had in the deliberation room with her, and daughter's lunch. Daughter responded to most of these questions, although she was out of her seat most of the time. When the prosecutor asked daughter to tell her "what [Papi] did to [her] butt with his tongue," however, daughter flatly refused. Referring to statements daughter had apparently made during a break, the prosecutor was eventually able to elicit daughter's testimony that she was "scared" to talk about this topic "[b]ecause [Papi] did something to [her]." Daughter failed to respond to the prosecutor's repeated questions about what her father had done, however, and daughter's testimony was halted again so that the parties and trial court could discuss outside the jury's presence "what the next step is going to be in this case."

After acknowledging that daughter was "not answering questions about anything related to what happened to her," the prosecutor requested that the trial court break for the day, saying, "I don't think that it is unreasonable to ask for one last opportunity at a break for me to have time with [daughter] to see if there's anything I can do to get her to talk about this in front of the jury[.]" The court noted its concern that there had already been multiple breaks since daughter had begun testifying, even though the actual testimony "lasted very, very briefly," and it expressed skepticism that an "overnight break" would accomplish anything. After hearing argument from the parties, the court agreed to break for the day but indicated that if daughter refused to testify the following morning, "there will be nothing further that can be done."

When the jury returned, the prosecutor made one more attempt to question daughter. She asked daughter four more times to say what Giron-Chamul had done to her, and daughter refused, disappearing under the table. Daughter then said, "I'm not going to answer questions," the prosecutor made her request to break for the day, and the trial court granted it, saying, "I am prepared to give you one final opportunity so that we

11

can reconvene in the morning . . ., and if you are not able to go forward at that time, then some decisions will need to be made."

The following morning, daughter resumed her testimony. She was permitted to color in a coloring book while testifying, and this helped her to sit still through most of the first portion of her testimony.

The prosecutor began by showing daughter various photographs of Giron-Chamul's house, and daughter identified his bedroom and her bedroom. She was then shown her drawing from the daycare provider's house again, and she agreed that it showed "[her] butt and [Papi's] tongue" and was "a picture of something that happened." The prosecutor asked, "Can you please tell me what [Papi] did to your butt with his tongue?" Daughter responded, "Licked it."

Next, daughter was asked whether "[Papi] put his tongue on any other part of [her] body," and she responded that she did not know. The prosecutor showed her the female anatomical diagram from the forensic interview, pointed to the figure's vagina, and said, "[W]e were going to talk about this private part here. We were going to call that a 'colita' at the time. Remember we said that yesterday?" Daughter agreed. The prosecutor asked, "Can you tell me, has [Papi] ever put his tongue on your colita?" Daughter said, "Yes." The prosecutor was then able to elicit testimony that this had happened in Giron-Chamul's room, on his bed, while daughter was lying down. Giron-Chamul did not have his clothes on, and he had put his tongue "on [her] colita; on [her] skin," not on her clothes. Daughter said it had happened 10 times when she was four years old. She did not respond, however, to questions about whether Giron-Chamul had performed this act in any other room of the house. And when the prosecutor asked

12

daughter about her testimony that Giron-Chamul had licked her "butt," daughter said it also had happened 10 times but then said he "was licking his underwear."[15]

The prosecutor repeatedly asked daughter whether Giron-Chamul had ever touched any part of her body with his penis, and daughter finally responded that "he just put his penis in his mouth." Putting her thumb in her mouth, she said, "This is the penis. . . . He drink it just like a baby." The prosecutor then asked, "[D]id he ever put his penis on your colita?," and daughter responded affirmatively. She said this touching occurred at Giron-Chamul's house in his bedroom, but she resisted the prosecutor's attempts to learn further details, saying that she did not know, refusing to answer, or attempting to change the subject.

After several minutes passed without any relevant testimony being elicited, the prosecutor returned to showing daughter photographs of Giron-Chamul's house. Daughter began providing responsive answers again, including her testimony that she sometimes slept in Giron-Chamul's bed and that her father "licked [her] boobies." She became evasive, however, when the prosecutor asked a series of questions about whether Giron-Chamul had made daughter put her mouth on his body, whether he put his penis on any other part of her body, or whether he had touched her "colita" with his hand. After daughter crawled under the table and refused to answer more questions, the trial court granted the prosecutor's request for a recess.

After the break, the prosecutor said to daughter, "[W]hen we were talking before, we had talked about your [papi] putting his tongue on your colita." Daughter said, "I don't want to talk about this," and disappeared under the table. For the next few minutes, daughter moved around under the table and throughout the room, refusing to answer the

---

[15] The transcript of this testimony reads, "No, he was licking. He's a millionaire." Daughter can be heard saying "his underwear," however, on one of the video recordings. Although an appellate court generally must assume that the reporter's transcript is accurate (see Code Civ. Proc., § 273, subd. (a); *People v. Huggins* (2006) 38 Cal.4th 175, 191, fn. 5), we conclude that the video recordings are " 'entitled to greater credence' " than the reporter's transcript and therefore " 'prevail' " to the extent there is a conflict between them and it. (*People v. Smith* (1983) 33 Cal.3d 596, 599.)

13

prosecutor's questions about Giron-Chamul's touching of her with his hands or tongue. She returned to look at the monitor after asking to see a photograph of Giron-Chamul's garage, but when the prosecutor could not produce the photograph she wanted, she went back under the table.

After a sidebar, daughter got back into her chair, and the prosecutor asked her several questions about other topics, including the other children at the daycare, "Kyra," whom daughter said was her best friend, and the food daughter had eaten recently. Daughter responded to most of these questions, although she went under the table again. When the prosecutor resumed questioning daughter about what Giron-Chamul had done, however, daughter stopped cooperating again. She denied that Giron-Chamul had "put his penis in [her] colita" and said she did not "want to talk about this." She then stopped responding at all and refused to get back in her chair.

After another sidebar, the prosecutor promised that she would ask daughter "only . . . a few more questions." Daughter initially came out from under the table and sat in the victim advocate's lap, but she did not respond to several questions about what Giron-Chamul had done. After Giron-Chamul's trial counsel objected to a question about a statement daughter had made during the forensic interview, the prosecutor stated, "[Daughter's] being willfully evasive at this point. I'm asking her about prior inconsistent statements."

Daughter eventually agreed that she remembered saying during the forensic interview that Giron-Chamul had "put his finger in [her] colita." The prosecutor repeatedly asked her whether this had actually occurred, with no response, before daughter finally said, "Yes." Daughter then testified that it happened in Giron-Chamul's room, he was not wearing clothes, and she was sitting up with her clothes on but he "ripped" her clothes. When asked about the ripping of clothes, however, daughter complained that she was "tired" and "[her] tummy hurt[]," and she mostly stopped answering questions. After several minutes of this, the prosecutor finally ended the examination, saying, "I think that's about the best she can do at this point."

14

4.      Cross-examination.

Cross-examination began after a recess was taken.  Daughter was back in her chair and coloring.  In response to Giron-Chamul's trial counsel's questions, she eventually testified that the terms "pompi al frente" and "pompi del atras" both meant "butt," although she complained several times that she did not like it when defense counsel spoke Spanish.  Defense counsel then asked "who told [her] about the word 'penis,' " given that she had used the word "colita" to refer to her father's penis during the forensic interview.[16]  Daughter began moving her lips without making any sound, which she explained was her "talking crab," something she had learned to do from a friend.  She continued talking crab as defense counsel asked her more questions.  Eventually, she said she wanted to talk to the prosecutor instead of him.

Defense counsel then asked a series of questions about daughter's testimony that Giron-Chamul had ripped her clothes.  Daughter said she "[did not] like talking about that," but she did testify that her father had ripped her "Hello Kitty suit" with his hands while it was hanging on a hanger in the closet.  She also said she had "[a] thousand" Hello Kitty suits at her father's house and "[a] thousand" more at her mother's house.  When defense counsel asked her what Giron-Chamul did with the suit after ripping it, daughter disappeared under the table.

Soon, daughter came out and got into the victim advocate's lap, but she refused to face the camera transmitting her image to the courtroom and did not give intelligible responses to defense counsel's questions about the drawing from the daycare provider's house.  After a short sidebar, defense counsel told daughter that they were going "to talk about other stuff that's a little more fun," and she answered a series of questions about the Disney character Jasmine.  But when defense counsel asked if she remembered saying during her direct testimony "that [she] was in [her] room and [Papi] was coming into

---

[16] K.S. subsequently testified that she taught daughter the terms "in both English and Spanish" for "a male body part" a few months after the forensic interview, prompted by a discussion with the prosecutor about the need for daughter to "be able to articulate the different body parts for the jury."

15

[her] room, but he left, and . . . he was going to see other little girls,"[17] she would not answer and began talking crab again.

Eventually, daughter answered a few questions about "Jessie," but she lay down in the victim advocate's arms and would not answer when defense counsel asked her about "Kyra." Defense counsel switched to questions about more innocuous topics, including a children's television show, but daughter said she did not want to talk. When asked who had given her the doll she had had during the previous day's testimony, daughter denied that it was the victim advocate and refused to say who it was, prompting another sidebar. Upon returning to question daughter, defense counsel greeted her. She immediately disappeared under the table and refused to come out, and yet another sidebar was necessary.

Back on the record, the prosecutor attempted to convince daughter to talk to defense counsel by explaining that he was one of the prosecutor's friends, but daughter yelled "No" when asked if she would answer his questions. She said she "[did not] like talking to him" and wanted to talk to the prosecutor instead. Defense counsel offered to ask daughter questions with his back turned to her so she would not have to see his face. She agreed and got into the victim advocate's lap. But she became upset when defense counsel asked her about the Hello Kitty suits, said she did not want to talk to him, even if he changed the subject, and went back under the table. The trial court decided to break early for lunch.

After lunch and back on the record, daughter was in the victim advocate's lap, coloring. She answered questions about the Disney character Aladdin, and she eventually agreed that the victim advocate had given her the doll from the day before. But when defense counsel said he was "going to ask [her] a couple of questions about some of this stuff [the prosecutor] talked to [her] about now," daughter went under the table and began

---

[17] Daughter gave the testimony to which defense counsel was apparently referring after she was asked whether Giron-Chamul had "put his tongue on [her] colita" in any room other than his bedroom. She said, "I was in my room and . . . I closed my door, and [Papi] . . . was going in my door, but he can't" so he "goes somewhere else, and do that with a little girl."

16

crawling back and forth. She said it was "real" that her father had "put his mouth on his penis" and that it happened 10 times, but she refused to answer questions about what his penis looked like. After daughter hid behind a chair and would not come out, there was a sidebar. When testimony resumed, daughter would not answer questions about topics including what her father's penis looked like, whether she had seen anyone else's penis before, shapes, or swimming. Daughter went back under the table, and there was another sidebar.

When questioning resumed, daughter was sitting in the bailiff's lap. She answered questions about counting and her doll, claiming that the doll ate soup for lunch. Daughter was told that she could draw on the whiteboard, and she began writing numbers on it. At this point, she stopped answering questions, saying she did not want to talk anymore and "want[ed] to go home." The trial court called yet another sidebar.

After the sidebar, defense counsel asked daughter to draw a picture of Giron-Chamul's house on the whiteboard, but she said she did not know how. She then complied with counsel's request to draw a series of things unrelated to the case. But when counsel asked daughter whether he could "ask [her] about the other little girls that [she was] talking about to [the prosecutor] this morning at dad's house," daughter shouted, "No." She ran away from the victim advocate, who was trying to remove a pen from her mouth, and crawled under the table again.

Daughter soon returned to drawing on the whiteboard, but she would not answer defense counsel's questions about little girls being at Giron-Chamul's house. Nor did she respond to questions about what it looked like when her father put his penis in his mouth or what his penis looked like. She was eventually coaxed back into her chair, and when defense counsel asked her again whether she could "show us what it looked like when [Papi] put his penis in his mouth," she said, "Yes." Counsel told her to go ahead, at which point she disappeared under the table and said, "Tricked you."

The proceedings were paused for technological reasons, after which daughter sat in the victim advocate's lap and colored. She answered questions about drinking milk when she was a baby, but she again refused to demonstrate what it looked like when her

17

father put his penis in his mouth. Immediately afterward, however, she said she was ready to show defense counsel what her father's penis looked like, and she drew it on the whiteboard. She then drew another picture showing her father's "butt."[18]

Daughter erased the pictures and told defense counsel that she wanted to play Simon Says. He briefly indulged her, but she ignored him when he asked her several times about the last time she had talked to her father. As she continued drawing on the whiteboard, she testified that Giron-Chamul had one penis and she had seen it 10 times, but she then failed to respond to numerous questions about whether she had seen anyone else's penis. She eventually said, "I've seen it in this," and wrote the number "10" on the whiteboard. The prosecutor's objections to defense counsel's attempts to clarify were eventually sustained, and daughter's only further testimony on the topic was that the other people were boys whose names she did not know.

After another break for discussion of an evidentiary objection, daughter agreed to resume drawing on the whiteboard, but she would not answer questions about whether she had seen other people's penises or whether she understood various terms used to refer to going to the bathroom. Defense counsel returned to the topic of whether she had seen anyone else's penis, but after she continued not to respond, the trial court directed him to try another topic. When he asked her questions about the daycare provider's house, however, she continued to be unresponsive, and she soon disappeared under the table, prompting a sidebar. Afterward, she returned to the victim advocate's lap, but she squirmed and would not answer more questions about the daycare provider's house. She soon went under the table again, and the court determined they should break for the day.

Daughter's cross-examination resumed the following morning. As soon as defense counsel greeted her, daughter slid out of her chair and began walking around the

---

[18] It appears that daughter first drew a stick figure with a large, round head and two legs and scribbled at the juncture of the legs to indicate where a penis would be. She then drew another similar stick figure and made rounded lines in the middle to indicate buttocks. The trial court may have interpreted the stick figures to be penises themselves, however, as it later suggested that the drawings required knowledge of the actual appearance of a penis.

room. After she returned to her chair, defense counsel demonstrated the sizzling sound she had made in the forensic interview and asked her what it meant. In response, she licked her finger and touched her forehead, her hip, and her chest, but she then went under the table again. Defense counsel continued trying to get an answer from her, but she refused to come out from under the table so that he could demonstrate the action for her. She eventually responded that she did not know what the action meant and denied having done it when talking to anyone about her father.

Defense counsel then asked a series of questions about who was present when "[Papi] licked [her] butt," but daughter, who was still crawling around under the table, did not answer. When counsel switched to asking her about the drawing she had done at the daycare provider's house, daughter briefly emerged to look at the monitor, but she began walking around the room and did not respond to questions about the drawing except to say that she did not want to talk about it.

Daughter crawled under the table and started eating something. As she remained under the table, she answered a series of defense counsel's questions about when her father had "licked [her] butt." Daughter claimed that "Jessie" was present and said "stop it" when Giron-Chamul was licking daughter. Daughter also testified, "[Papi] got Jessie and lick her butt, and I said, 'Stop it,' and [Papi] licked my butt too." Finally, daughter claimed that Jessie's dad and one hundred of Giron-Chamul's "amigos" were present and that when his friends asked him to stop licking daughter and Jessie, Giron-Chamul said, " 'You can't stop me.' " Defense counsel asked, "Is what you are telling us right now real or not real, hon?," and daughter responded, "Real."

Defense counsel then asked more questions about where daughter had learned the term "penis." Daughter repeatedly refused to tell and said to counsel, "You're boring." The prosecutor eventually objected to this line of questioning, the objection was discussed at a sidebar, and the trial court sustained the objection.

After the sidebar, defense counsel indicated that he was going to ask daughter more questions, and she responded, "Leave me alone." Defense counsel asked a series of questions to determine whether daughter used the terms " 'peepee' " and " 'poopoo,' "

19

but she was uncooperative. Defense counsel then asked, "Did you tell your mommy that [Papi] peed on your neck?" Daughter responded affirmatively and said it was "real" that that had happened. Similarly, she agreed that she had told her mother that "[Papi] pooped in [her] hair" and that that was "real" as well. After defense counsel asked whether anyone else was there "when [Papi] pooped in [her] hair," however, daughter said, "Give me a break. Give me a break," and the trial court called a recess.

When testimony resumed, daughter was in her chair, coloring. Defense counsel asked daughter how her break was, but she did not respond and then admitted she was "ignoring" him. As he began to ask her another question, she got out of her chair, drew her hand across her throat, and made a gesture into the camera as if she were breaking something with both hands. She got back in her chair, but she told defense counsel to "[l]eave [her] alone" after he asked if she was ready to start answering questions.

Defense counsel told daughter they could talk about anything she wished, at which point she slid under the table. She was responsive to a few questions about Hello Kitty, but when defense counsel said he needed to "ask a couple more questions about the stuff [they] were just doing," she became unresponsive again. She refused to tell him whether anyone else was there when "[Papi] pooped in [her] hair." After defense counsel asked whether daughter saw "[Papi] put his penis in [Jessie's] colita" on the day that daughter "saw [Papi] licking Jessie's butt," daughter got into the victim advocate's lap and turned her face away. She then failed to respond to a series of other questions about that day and to the question whether she had ever "seen [Papi] lick any other little girl[s'] butts."

Still in the victim advocate's lap, daughter eventually began coloring again, and defense counsel moved to the topic of time-outs. Daughter was initially reluctant to respond, but she eventually agreed that her mother had told her during a previous break that "if [she] didn't pay attention, [she'd] get a time-out." After two brief sidebars in response to objections by the prosecutor, defense counsel said, "Hi, [daughter]," and daughter responded, "I don't want to." He then asked her whether her mother had told her "what to say" during a break. Daughter initially responded by talking crab and would

20

not give a verbal answer, but she eventually nodded affirmatively after being asked the same question several times.[19]

Defense counsel then returned to whether Giron-Chamul had done anything else to "Jessie" or to other girls. Daughter ignored repeated questions on this topic, prompting the trial court to ask whether she was able to hear. Daughter indicated that she could hear, but when defense counsel then asked her to look at the monitor, she sighed in exasperation and would not comply. The prosecutor requested a sidebar.

When the sidebar was over, the prosecutor asked daughter "to do a huge favor for [her]," explained that defense counsel "ha[d] questions that he want[ed] to ask [daughter]" for which he needed her to look at the monitor, and got daughter to agree that she would briefly look at him. Daughter watched as defense counsel demonstrated the sizzling action but then immediately went under the table. She failed to respond to repeated questions about whether she had "ever done that before with [her] finger and [her] hip." Only after defense counsel indicated his examination was almost done and promised he would not ask the question again if she "answer[ed] out loud" did daughter finally respond, "No."

Defense counsel then promised he was "really getting near the end" and would "ask these last questions really fast." Daughter resumed talking crab and would not get back in her chair. Counsel asked, "[H]as [Papi] ever done anything to hurt you before?" Daughter did not respond. Counsel then said, "[Daughter], answer this one. I'm really, really, really almost done, honey. Just look at us and tell us if [Papi] has ever done anything to hurt you before." Daughter, who was facing the water cooler in a corner of

---

[19] K.S. was recalled as a witness and testified that she told daughter during breaks in daughter's testimony to tell the truth and answer questions but did not instruct her on any specific responses to give.

21

the deliberation room, said, "Huh-uh."[20]  Neither defense counsel nor the prosecutor asked her any further questions.

### D.    *Giron-Chamul's Defense.*

The defense case, which also included the testimony of character witnesses, centered on Giron-Chamul's testimony, in which he denied having any inappropriate contact with daughter.  He acknowledged that he would touch her vagina on the occasions when he needed to clean it.  Due to daughter's young age, he also had to help her wipe herself after she had bowel movements.

His testimony suggested Giron-Chamul was very concerned about avoiding contact with daughter that might be misinterpreted.  For example, he said that when daughter stayed overnight at his house, she would fall asleep in her own bedroom, but she often woke up afraid.  He permitted her to sleep in his bed but placed "pillows in between [them]" because he did not "feel comfortable [about] her being next to [him]."  He also stated that on one occasion, K.S. was angry with him because he had not done a good job cleaning daughter's vagina, and he told K.S. that he was "not comfortable" doing so.  Similarly, his girlfriend testified that he told her K.S. wanted him to do a better job of cleaning daughter's vagina and applying the ointment, but he was "cautious" about doing so because he did not want to be accused of inappropriate touching.

Giron-Chamul had no explanation for where daughter might have learned to open and close her labia and say "eat me," how she could have learned about oral copulation and the other sexual behavior she seemed to allude to in the forensic interview and her testimony, why she would have drawn a picture of her bottom and his tongue, or why she would have accused him of molesting her.

---

[20] Defense counsel relied on this response in closing argument, telling the jury that he asked, " 'Has your daddy ever hurt you?' " and daughter "gave [him] a gleeful . . . " 'No.' "  The prosecutor also said in her closing that daughter "clearly said she wasn't hurt."  Based on the video recording of this exchange, however, it is unclear whether daughter meant that her father had never hurt her or, consistent with her prior resistance to cooperating, was simply refusing defense counsel's request to look at the camera and answer the question.

Giron-Chamul's testimony did, however, suggest the possibility that K.S. had a hand in prompting daughter's accusations. Giron-Chamul testified that he and K.S. had "a really messy break-up" and "she got really nasty" in text messages, which he had kept on an old cell phone after their separation because he was "scared" she might accuse him of something and he wanted proof of what she had said. For example, K.S. admitted that in April 2010, she sent him a text message saying, "We'll see one day if you [are] very sick or in jail, who is there for you."[21] In closing argument, Giron-Chamul's trial counsel argued that even if K.S. was not "vengefully, intentionally trying to imprison a man [whom] she [knew] didn't do it," she had made a serious mistake in interpreting daughter's behavior and had an interest in Giron-Chamul's being convicted to justify putting daughter through the investigation and trial.

## II.
### DISCUSSION

A.  *Giron-Chamul's Claim that His Statutory Right to a Speedy Trial Was Violated Lacks Merit.*

Giron-Chamul claims that the trial court erred by not dismissing the charges against him after the trial did not begin on time under section 1382, which provides a statutory right to a speedy trial. We reject this claim because he has demonstrated no prejudice from the purported error.

The original information was filed on December 15, 2011, and Giron-Chamul was arraigned five days later. He pleaded not guilty and did not waive time, requiring that the trial begin by February 21, 2012. Trial was set for February 16.

On February 10, the prosecutor moved to continue the trial because she had just learned the investigating police officer would be on vacation from February 17 to February 26. The trial court found good cause for a continuance. After Giron-Chamul stipulated to moving the last day for trial to February 23 and the prosecutor did not object, the court set the trial for that date.

---

[21] K.S. admitted that the break-up was "very difficult" and that she blamed Giron-Chamul for the end of their marriage because he had cheated on her. She claimed, however, that the April 2010 text message was a Spanish saying and was not meant as a threat.

On the morning of February 23, both counsel announced that they were ready to proceed. Counsel and the trial court then discussed the issue of when daughter's competency hearing should be held, with the prosecutor arguing it should occur before voir dire and Giron-Chamul's trial counsel arguing that either the jury should be sworn first or the parties should stipulate to having jeopardy attach once the competency hearing began. The court ruled it would hold the competency hearing before beginning voir dire. It attempted to begin the hearing later that morning, but as noted above, daughter became very upset upon taking the stand and the hearing was postponed.

Meanwhile, the trial court heard juror hardship requests, which resulted in the dismissal of all but 51 prospective jurors with some requests still pending. The court noted its belief that there were not "enough [prospective jurors] to warrant starting full voir dire." Defense counsel objected, arguing that trial would not commence within the statutorily required time period unless jury selection began that day. The court disagreed. After noting that it would continue to deal with hardships and consider the parties' motions in limine, it stated, "So we will be engaged and moving forward doing things that we normally do before a jury trial starts. There's not a whole lot of difference; it's just that our number of jurors was inadequate, given the hardships that were requested." About 40 jurors were left after the hardship process was completed.

The next day, Giron-Chamul moved to dismiss the case on the ground that his right to a speedy trial had been violated. On February 27, when the parties next returned to court, defense counsel argued that the stipulation to February 23 as the last day of trial did not trigger the 10-day grace period under section 1382, subdivision (a)(3)(B) because the prosecutor did not assert a right to the additional time. After taking the matter under submission, the trial court ultimately denied the motion to dismiss. Although it agreed that the grace period did not apply, it determined that trial had commenced on February 23 despite the fact that voir dire had not begun that day.[22]

---

[22] Giron-Chamul filed a petition for writ of mandate to challenge the trial court's ruling, which this court denied on February 29, 2012.

Section 1382 provides that "unless good cause to the contrary is shown" or the defendant waives the time limit, a trial court must dismiss a felony case "when [the] defendant is not brought to trial within 60 days of the defendant's arraignment[.]" (§ 1382, subd. (a)(2).) "When a defendant's trial has been properly continued to a date beyond the 60-day period, section 1382 further provides that the defendant is entitled to be brought to trial on the new trial date 'or within 10 days thereafter.' (§ 1382, subd. (a)(2)(B).)" (*Smith v. Superior Court* (2012) 54 Cal.4th 592, 609.)

Giron-Chamul claims he was not "brought to trial" in time based on decisions establishing that " 'an accused is "brought to trial" within the meaning of section 1382 when a case has been called for trial by a judge who is normally available and ready to try the case to conclusion. The court must have committed its resources to the trial, and the parties must be ready to proceed and a panel of prospective jurors must be summoned and sworn.' " (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1196.) He argues that even though the trial court and the parties were ready to proceed on February 23, the "last day of trial agreed to by the defense," he was not brought to trial on that day because the court did not summon and swear the jury panel.

We agree with the trial court's determination, which neither party challenges, that the 10-day grace period under section 1382, subdivision (a)(2)(B) was not triggered by Giron-Chamul's stipulation to a two-day extension of the last date for trial. (See *Bailon v. Appellate Division* (2002) 98 Cal.App.4th 1331, 1345-1349.) We need not determine whether Giron-Chamul was "brought to trial" under section 1382 on February 23, however, because he fails to establish that any prejudice resulted from the purported delay. Although prejudice is presumed when a defendant seeks pretrial writ relief for a violation of section 1382, "on appeal from a judgment of conviction a defendant asserting a statutory speedy trial claim must show that the delay caused prejudice," such as if "the statute of limitations would bar a new information or indictment for the same offense." (*People v. Martinez* (2000) 22 Cal.4th 750, 769; *People v. Egbert* (1997) 59 Cal.App.4th 503, 513, fn. 4.) But Giron-Chamul never mentions the issue of prejudice in his briefing, even in response to the Attorney General's argument that he failed to make the required

25

showing. Thus, even if we were to assume that his right to a speedy trial was violated, he is not entitled to relief.

B. *The Conviction Was Supported by Sufficient Evidence.*

Giron-Chamul argues that there was insufficient evidence to convict him of oral copulation with a child aged 10 years or younger. Although we recognize that daughter refused to answer many questions and made fantastical and sometimes inconsistent assertions, we nonetheless conclude that her trial testimony constituted substantial evidence to support the conviction.[23]

In evaluating Giron-Chamul's claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Section 288.7, subdivision (b) provides that "[a]ny person 18 years of age or older who engages in oral copulation . . . with a child who is 10 years of age or younger is guilty of a felony[.]" In turn, "oral copulation" is defined as "the act of copulating the mouth of one person with the sexual organ or anus of another person." (§ 288a, subd. (a).) " '[A]ny contact, however slight, between the mouth of one person and the sexual organ [or anus] of another person constitutes oral copulation.' " (*People v. Dement* (2011) 53 Cal.4th 1, 41-42.)

In her closing argument, the prosecutor identified two alternative acts that could support Giron-Chamul's conviction of the oral-copulation count: that his mouth had

---

[23] In light of this conclusion, we need not consider whether daughter's statements during the forensic interview also constituted substantial evidence of Giron-Chamul's guilt.

contact with daughter's "vagina" or that it had contact with her "butt." As required, the trial court gave a unanimity instruction directing that the jurors had to unanimously agree on the same act to convict. (See *People v. Napoles* (2002) 104 Cal.App.4th 108, 114.)

The prosecutor's argument was incorrect to the extent it suggested that Giron-Chamul could be convicted if the evidence showed that he had licked daughter's buttocks, as opposed to her anus.[24] But "when a prosecutor argues two theories to the jury, one of which is factually sufficient and one of which is not, . . . the reviewing court must assume that the jury based its conviction on the theory supported by the evidence." (*People v. Seaton* (2001) 26 Cal.4th 598, 645.) Thus, we need not determine whether daughter's testimony that her father licked her "butt" constituted sufficient evidence to support the theory that he orally copulated her anus because we conclude there was sufficient evidence that he orally copulated her vagina.

Daughter's testimony during trial constitutes substantial evidence that Giron-Chamul's mouth had contact with her vagina. As set forth above, the prosecutor showed daughter the female anatomical diagram, pointed to the figure's vagina, and said, "[W]e were going to talk about this private part here. We were going to call that a 'colita' at the time." After daughter said she remembered, the prosecutor asked, "Can you tell me, has [Papi] ever put his tongue on your colita?" Daughter responded, "Yes." She testified that it had happened at Giron-Chamul's house on his bed. The prosecutor then asked, "Did he put his tongue on your clothes, . . . or did he put it on your colita on your skin?" Daughter responded, "On my colita; on my skin."

Giron-Chamul argues that, despite this testimony, there was insufficient evidence of oral copulation of daughter's vagina because daughter "used the term 'colita' to [refer] to both her vaginal area and her butt." He points to K.S.'s testimony that the term " 'colita' " is used to "generaliz[e] the private parts in Spanish" and that daughter used it

---

[24] Although a defendant cannot be convicted of oral copulation with a child aged 10 years or younger for the act of licking a child's buttocks, we do not mean to suggest that such an act is not a criminal offense. Here, Giron-Chamul was never charged with, and the jury was not instructed on, any such offense.

to refer to "her private parts." He also points to the daycare provider's testimony that daughter referred to her vagina as her " 'pompi al frente' " and her butt as her " 'colita.' " In addition, in giving the testimony quoted above about Giron-Chamul's tongue touching her "colita," daughter appeared to mix up the terms "colita" and "butt." For example, after she said her father had put his tongue directly on her skin, the prosecutor asked her, "[W]hen he did that, what did he do with his tongue?" Daughter responded, "Just licked my butt; and licked my butt." This conflict in the evidence about which terms daughter used to refer to which body parts does not, however, require reversal. Daughter herself testified that she called her vagina "colita" and her bottom "butt." This was substantial evidence that she meant her vagina when she indicated that Giron-Chamul had "put his tongue on [her] colita." (See *People v. Manibusan*, *supra*, 58 Cal.4th at p. 87.)

C. *Daughter Was Properly Determined to Be Competent to Testify.*

Giron-Chamul claims that the trial court erred by determining that daughter was competent when she testified at trial, because her testimony reveals that she was "unable to distinguish between what was true and what was false." We conclude that the court did not abuse its discretion.

As mentioned above, the trial court held a hearing on daughter's competency before the jury was sworn. In finding daughter competent, the court "acknowledge[d] that she had a lot of energy and lost interest in this proceeding, was wiggling all over the table and crawled under the table once she became very bored" but found that "her answers . . . satisfied the requirement of the law that she understand her duty to tell the truth." Giron-Chamul does not challenge this ruling.

After daughter testified, Giron-Chamul moved to strike her testimony on the basis that its "fantastical" nature demonstrated she was "unable to understand [her] duty to tell the truth" and did not "have the capacity to understand the difference between the truth

28

and a lie." The trial court denied the motion, finding that daughter had "testified competently" under Evidence Code section 701, subdivision (a)(2).[25]

Giron-Chamul raised the issue again in his motion for a new trial. In denying the motion, the trial court found that daughter "quite patently knew the difference between the truth and a lie . . . and understood her duty to tell the truth." It observed that daughter "seemed very rigorous in her integrity in terms of when things were said that she thought were not true," as revealed when, for example, Giron-Chamul's trial counsel counted using the wrong sequence of numbers and she corrected him. The court also disagreed that daughter's more unbelievable statements—including her claims that her father had put his mouth on his own penis and had molested her in front of many other people— bore on her competency, stating that "there is a distinction between a person being competent versus someone being credible, and that credibility is a call for the jury."

In general, "every person, irrespective of age, is qualified to be a witness." (Evid. Code, § 700; see *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1368 [collecting cases in which four- and five-year-old children found competent to testify].) "A person is disqualified to be a witness," however, "if he or she is . . . [i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a)(2).) The issue of competency is distinct from the issue of credibility, and "contradictory [or inconsistent] testimony does not suffice to show incapacity to understand the duty of truth[.]" (*People v. Avila* (2006) 38 Cal.4th 491, 589; *People v. Mincey* (1992) 2 Cal.4th 408, 444; *In re Katrina L.* (1988) 200 Cal.App.3d 1288, 1299.) The party challenging a witness's competency has the burden to prove incompetency by a preponderance of the evidence. (*Avila*, at p. 589.) "We . . . uphold a trial court's ruling on the competence of a witness in the absence of a clear abuse of discretion." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1265.)

---

[25] The trial court also ruled that daughter was competent under Evidence Code section 701, subdivision (a)(1), which applies to witnesses who are "[i]ncapable of expressing [themselves] concerning the matter so as to be understood." Giron-Chamul does not rely on that statutory provision in making his claim on appeal, and we do not discuss its application here.

Giron-Chamul relies exclusively on *People v. Lyons* (1992) 10 Cal.App.4th 837, which reversed a conviction based on the admission at trial of the preliminary-hearing testimony of an adult witness—found incompetent at the time of trial—who "was delusional and unable to distinguish truth from lies at the time of the preliminary hearing." (*Id.* at pp. 844-845.) The *Lyons* witness testified at the preliminary hearing that the defendant had "penetrat[ed] her in one of her 'three holes,' " explaining that she "ha[d] a third orifice between her vagina and anus." (*Id.* at p. 842.) She also testified that the defendant's father had killed her first husband and the "defendant had killed her second husband . . . by blowing up the airplane on which he was flying." (*Id.* at p. 843.) Finally, "an in camera hearing at trial . . . revealed that [she] might suffer from a multiple personality syndrome." (*Ibid.*) Giron-Chamul argues that daughter "testified to 'facts' that were just as fantastic," including her testimony "that she had 1000 Hello Kitty [suits] at her mother's house," that "she had seen [Giron-Chamul] place his own mouth on his penis [10] times," and that other girls, "Jessie," and "hundreds of his friends" were there when her father "licked her butt."

Daughter's testimony was not akin to that of the witness in *People v. Lyons*, *supra*, 10 Cal.App.4th 837. During both the pretrial hearing on her competency and her testimony on direct, daughter demonstrated that she understood the difference between the truth and a lie, the consequences of lying, and the requirement that she tell the truth in court. In contrast, the *Lyons* defendant did not challenge the witness's truth competency at the preliminary hearing, and the witness apparently was not questioned at that time about her appreciation of the duty to be truthful. (*Id.* at p. 844.) Thus, unlike here, there was no direct evidence that the witness understood that duty at the relevant time.

Moreover, daughter is a child, and children have imaginations. "[T]he fact that a very young witness makes inconsistent or exaggerated statements does not indicate an inability to perceive, recollect, and communicate or an inability to understand the duty to tell the truth," even if some parts of the child's testimony may be "inherently incredible." (*Adamson v. Department of Social Services* (1988) 207 Cal.App.3d 14, 20; see, e.g., *People v. Burton* (1961) 55 Cal.2d 328, 341-342 [child witness understood difference

30

between truth and lies despite "asserted inherent improbability of her testimony that on two previous occasions when [the] defendant committed the lewd act [against her] an 18-year-old girl was present and did nothing"]; *In re Amy M.* (1991) 232 Cal.App.3d 849, 857-858 [upholding finding of competency where child testified to "hallucinations" about her mother and guinea pig].)  Instead, "questions about whether aspects of [a child's] testimony were believable are questions of credibility for the trier of fact."  (*Adamson*, at p. 20.)  We acknowledge that some of daughter's fantastical statements are troubling, especially because her testimony about Giron-Chamul's actions was hardly clear or detailed and no evidence from any independent source corroborated her account of being molested.  (Cf. *Burton*, at p. 342; *Amy M.*, at p. 858.)  But we agree with the Attorney General that the statements identified by Giron-Chamul ultimately bear on daughter's credibility, not her competency, and are therefore insufficient to disturb the trial court's competency ruling.  (See *People v. Avila*, *supra*, 38 Cal.4th at p. 589.)

> D.      *Giron-Chamul Was Denied His Constitutional Right to Confrontation Because He Did Not Have an Adequate Opportunity to Effectively Cross-examine Daughter.*

Giron-Chamul claims that daughter's refusal to answer questions on cross-examination denied him his constitutional right to confrontation.  We agree.[26]

At the close of the prosecution's case, Giron-Chamul moved to strike daughter's testimony on the basis that "the entirety of the interaction," particularly "her refusal to answer many of the [defense's] questions," denied him his right to confrontation.  In response, the prosecutor noted that Giron-Chamul's trial counsel ended the cross-examination while daughter was still answering questions and there was "absolutely no

---

[26] We do not decide whether this conclusion bars a retrial of the charge because the parties have not briefed the issue.  But a retrial is not normally barred "where the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict . . . ."  (*Lockhart v. Nelson* (1988) 488 U.S. 33, 40-41; *People v. Story* (2009) 45 Cal.4th 1282, 1296-1297.)  Although daughter's testimony should have been stricken because Giron-Chamul's right to confrontation was violated, the testimony was, as we have discussed, substantial evidence sufficient to sustain a guilty verdict.

31

evidence" that she would have stopped doing so. The trial court denied the motion, finding that "although it was challenging for both counsel . . ., . . . she was giving information[.]" The court also agreed that defense counsel "stopped questioning and so there's no basis for believing that [daughter] was refusing to testify. [¶] She initially announced that [she would not answer questions] at the outset of her cross-examination, but then continued to provide information upon questioning, although it was quite challenging."

In his motion for a new trial, Giron-Chamul renewed his claim that his right to cross-examination was violated. In denying the motion, the trial court discussed at length its reasoning and daughter's testimony:

> "As I looked through the testimony of [daughter], it appeared that clearly, that she frequently refused to answer questions that were put to her by both sides . . . . On those occasions, it appears that she simply chose not to answer the questions. She seemed to have extreme difficulty in communicating regarding the events in question when she did testify directly to the questions.

> The Court would note that she would not comply with the Court['s] orders to sit, to answer questions, and she was repeatedly admonished by the Court, by the prosecutor, and by the [victim advocate], by her mother, and . . . [the prosecutor] had to tell [daughter] to answer defense questions, and [daughter] was resistant.

> [¶] . . . [¶] It struck me that it appeared she refused to answer perhaps 60 percent of the questions that were put to her, if not more, and eventually, with much prompting by [the prosecutor], she did grudgingly give up a small amount of information.

> [¶] . . . [¶] [Daughter] could talk about the substance of this case, but did not want to. She had the capability, but did not have the desire to talk about it, and . . . it became a very challenging process for [the prosecutor] to get her to answer questions after [her drawing] had been shown and she saw her father sitting out in the courtroom.

> It was quite clear to the Court that she was traumatized by that picture and the discussion that ensued around it having to do with [Papi], and the Court notes that she would not answer questions after being shown that picture and asked questions about the context in which that occurred.

32

The Court notes that during the times that she was in the room and the picture was not being shown and the monitor was off and she could not see her father, she was very casual, very chatty, relaxed, but the minute she could see her father and the talk turned to the substance of this case, she became a very reluctant witness. She did testify, but it was very challenging for both counsel to try to get her to make statements.

[¶] . . . [¶] There were a number of times when she flat-out refused to answer questions from [defense counsel], and other times, when she would answer questions. There was a vigorous back and forth between the two of them, and she was as resistant to answering his questions as she was . . . [the prosecutor's] questions, and we had to take breaks.

[¶] . . . [¶] [T]his witness answered questions, didn't answer questions, was in her chair, was under the table, but again, this was a five[-] year[-]old who had just turned five, who was asked to testify about someone [whom] she loved very much and was very upset about having to come in to [c]ourt and testify.

[¶] . . . [¶] She was able to talk about it, but it took a lot of work on the part of both attorneys to get her to do so, and when she made statements regarding what had happened, she made them, and it was clear from her statements that she was reluctant to say that, but again, she did make statements.

In fact, [defense counsel] . . . was the one who actually got her to get up and draw a picture of what she said was her father's penis and butt. She did refuse to answer a number of questions. She would crawl under the table, would look very distressed and would say, 'My tummy hurts,' multiple times. 'I don't want to,' multiple times. There were frequent breaks, but the fact that the examination by the attorneys was difficult does not mean that the defendant was denied his right to cross-examine this witness.

He . . . did cross-examine this witness. He was able to get her to say statements such as, 'My daddy had his mouth on his own penis, and . . . he molested me in front of a large group of people . . . .['] That could be fodder during argument that the child was not believable[.]

[¶] . . . [¶] The minute the questions turned to molestation, she would be very reluctant to answer, and would then crawl under the table and refuse to answer until she was prompted over an extended period of time.

This happened with both counsel, and ultimately, she was able to get her testimony out, and so to the charge that the defendant was not able to effect cross-examination of this witness, the Court would say, the record does not support that allegation.

There was a cross-examination. It was difficult. It was very, very hard on both sides, but [Giron-Chamul] did . . . cross-examine this child[.]"

With these observations by the trial court in mind, we turn to the applicable law. "The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' " (*United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*).) "This has long been read as securing an adequate opportunity to cross-examine adverse witnesses" (*ibid.*), which requires that the defendant " ' "[have] an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." ' " (*People v. Cromer* (2001) 24 Cal.4th 889, 896-897, quoting *Mattox v. United States* (1895) 156 U.S. 237, 242-243.) " 'The right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is [also] a denial of the Fourteenth Amendment's guarantee of due process of law.' "[27] (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137, quoting *Pointer v. Texas* (1965) 380 U.S. 400, 405; see also *Cromer*, at p. 897.) "[W]here a party is deprived of the benefits of cross-examination of a witness by refusal of the witness to answer, the trial court may strike out the direct examination." (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial

_____

[27] The California Constitution and the Penal Code also provide "specific guarantee[s] of the right to confrontation." (*People v. Winslow* (2004) 123 Cal.App.4th 464, 469; Cal. Const., art. I, § 15; § 686, subd. 3.) Although Giron-Chamul relies on both the federal and state Constitutions, we refer to the Sixth Amendment's Confrontation Clause throughout because the state Constitution provides no more protection than the Sixth Amendment does. (See *People v. Gonzales*, *supra*, 54 Cal.4th at p. 1271; Cal. Const., art. I, § 24.)

§ 240, p. 349; see also *People v. Price* (1991) 1 Cal.4th 324, 421; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735.)

We review de novo a claim under the Confrontation Clause that involves mixed questions of law and fact. (*People v. Cromer*, *supra*, 24 Cal.4th at pp. 896-897, 899-901.) Under this standard, we defer to the trial court's determination of "the historical facts"—which "will rarely be in dispute"—but not the court's "application of [the] objective, constitutionally based legal test to [those] historical facts." (*Id.* at p. 900.) This standard of review is particularly appropriate here, where we have had the benefit of reviewing the video recordings of daughter's testimony for ourselves and are thus in a better-than-normal position to evaluate whether the defendant had an adequate opportunity for effective cross-examination.

Initially, we disagree with the Attorney General to the extent she suggests, as did the trial court and prosecutor, that Giron-Chamul forfeited this claim by "end[ing] his cross-examination at a time when [daughter] was still 'giving information.' " The record does not support this characterization. During the last half-hour of daughter's testimony, daughter answered almost none of Giron-Chamul's trial counsel's questions, to the point that the prosecutor had to intervene for a second time to urge her to answer. The only relevant information daughter imparted during that time, and only after great resistance, was that her mother had told her "what to say" and that she would get a time-out if she did not pay attention, that she had never made the sizzling gesture, and, depending on one's interpretation of the relevant testimony, that Giron-Chamul had never hurt her before. And daughter gave the latter two answers only after defense counsel began promising that his examination was almost finished. This is not a case where the defendant had an opportunity for cross-examination but chose to forgo it as a matter of strategy. (Cf. *State v. Nyhammer* (N.J. 2009) 963 A.2d 316, 334 [no record on which to decide whether Confrontation Clause violated because defense counsel chose not to cross-examine child on her accusations after she was unresponsive on direct].) To the contrary, defense counsel did all he could reasonably be expected to do, given daughter's

resistance, to elicit relevant information from her. We conclude that Giron-Chamul preserved this claim and therefore turn to consider its merits.

Although the Confrontation Clause " 'guarantees . . . "an opportunity for effective cross-examination," ' " it does not entitle defendants to " ' "cross-examination that is effective in whatever way, and to whatever extent, [they] might wish." ' " (*Owens*, *supra*, 484 U.S. at p. 559.) In particular, it " 'includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' " (*Id.* at p. 558; see also *Crawford v. Washington* (2004) 541 U.S. 36, 62 [Confrontation Clause "is a procedural rather than a substantive guarantee" and "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"].[28])

Thus, a witness's failure to remember, whether real or feigned, generally does not deny the defendant an opportunity for effective cross-examination. (See, e.g., *Owens*, *supra*, 484 U.S. at pp. 558-559; *People v. Clark* (2011) 52 Cal.4th 856, 927; *People v. Gunder* (2007) 151 Cal.App.4th 412, 420; *People v. Perez* (2000) 82 Cal.App.4th 760, 762, 765-766.) Similarly, a witness's difficulty in communicating is insufficient to establish a constitutional violation, even if it limits the types of questions that the cross-examiner may ask. (See, e.g., *People v. Tran* (1996) 47 Cal.App.4th 759, 765-768, 770 [adequate opportunity for cross-examination where witness who was unable to speak because of his injuries "testified at trial by tapping a pencil in response to questions, once for yes and twice for no"]; cf. *People v. Brock* (1985) 38 Cal.3d 180, 191, 193-194, 197

---

[28] Although *Crawford v. Washington*, *supra*, 541 U.S. 36 changed the landscape of Confrontation Clause jurisprudence, our state Supreme Court has observed that "[n]othing in *Crawford* casts doubt on the continuing vitality of *Owens*," *supra*, 484 U.S. 554. (*People v. Cowan* (2010) 50 Cal.4th 401, 468.)

36

[no opportunity for meaningful cross-examination where defense asked terminally ill witness two questions before she was unable to proceed].)

Giron-Chamul's claim, however, is premised on daughter's "refusal to answer . . . important questions" posed by his trial counsel. A defendant's "opportunity [to cross-examine] may be denied if the witness refuses to answer questions." (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1390-1391.) Several decisions have held that the right to cross-examination is violated where a prosecution witness refuses to answer almost all of the questions posed at trial. (E.g., *Douglas v. Alabama* (1965) 380 U.S. 415, 416-417, 419-420; *People v. Murillo* (2014) 231 Cal.App.4th 448, 451, 456; *People v. Rios* (1985) 163 Cal.App.3d 852, 860-861, 864; *People v. Woodberry* (1970) 10 Cal.App.3d 695, 706.) On the other hand, a witness's "refusal to answer [defense] counsel's questions" does not violate the Confrontation Clause, even if it " 'narrow[s] the practical scope of cross-examination," so long as the jury has " 'the opportunity to assess [the witness's] demeanor and whether any credibility should be given to [his or her] testimony or . . . prior statements.' " (*People v. Homick* (2012) 55 Cal.4th 816, 861 (*Homick*).)

Daughter's cross-examination was spread over two days during which there were frequent recesses. Her relevant testimony during that time amounted to the following. Daughter provided some details about when Giron-Chamul "licked her butt," including who was present, she answered questions about the ripping of the "Hello Kitty suit," and she drew her father's penis and bottom. She claimed that Giron-Chamul "peed" on her neck and "pooped" on her hair and put his mouth on his own penis. And she testified that her mother had told her what to say and threatened her with a time-out if she did not pay attention. But she would not answer hundreds of other questions, including approximately 150 questions on important topics such as where she learned the word "penis," whether she had seen the penis of anyone other than her father, the circumstances under which she saw him "licking Jessie's butt," and anything related to her drawing or forensic interview.

The Attorney General argues that because Giron-Chamul "was able to exploit some of [daughter's] more implausible statements to [his] benefit" in closing, "it cannot

be said that the defense attorney's cross-examination of [daughter] was so meaningless as to violate the right of confrontation." We disagree that the Confrontation Clause is necessarily satisfied whenever a defendant is able to extract some testimony that arguably discredits the witness. The Confrontation Clause demands more, particularly when, as here, the testimony extracted cries out for additional cross-examination. The determinative measure is whether the defendant had "a full and fair opportunity" to test the witness's knowledge and credibility before the jury. (*Owens*, *supra*, 484 U.S. at p. 558; *Homick*, *supra*, 55 Cal.4th at p. 861; *People v. Cromer*, *supra*, 24 Cal.4th at pp. 896-897.)

Evaluating whether the defendant had such a fair and full opportunity depends in part on the inferences that can be drawn from a witness's refusal to answer questions, and these inferences are different when the witness is a young child. In *Homick*, the defendant's adult accomplice testified for the prosecution at trial and "claimed that his prior statements . . . were lies . . . ; asserted his lack of memory; spewed irrelevant information . . .; refused to answer questions; and generally behaved in an uncooperative and childish manner." (*Homick*, *supra*, 55 Cal.4th at pp. 856-858.) Recognizing that the accomplice witness was "difficult and defiant," our state Supreme Court held that admission of his testimony was nevertheless constitutional because the jury was able to assess his credibility and "to the extent that his behavior on the stand reflected poorly on his credibility, it benefited [the] defendant." (*Id.* at p. 861.) *Homick*'s reasoning does not apply to child witnesses. An adult witness's difficult and defiant conduct, such as refusing to answer questions, gives rise to an inference that the testimony the witness *does* give is not believable. (See *ibid.*; *People v. Sanders* (2010) 189 Cal.App.4th 543, 556 [when "cross-examination is curtailed because [a] question will not be answered, there is a compensating benefit in that the jury is empowered to conclude that the witness is not credible, or is not entirely credible; that might well have been the whole point of the unanswered question"].) A similar inference does not arise when a child witness has difficulty answering questions. Indeed, a child's reluctance to answer questions, especially about sensitive subjects such as molestation, may *enhance* the child's

credibility to the extent it suggests that whatever happened is too traumatic for the child to discuss. Here, daughter's refusal to answer numerous questions did not in and of itself suggest a lack of credibility as it might for an adult.

There is a dearth of California authority addressing the circumstances under which a defendant might be denied an adequate opportunity to effectively cross-examine a very young child. Certainly, it has been recognized that "simply putting a child on the stand, regardless of her mental maturity, is not sufficient to eliminate all Confrontation Clause concerns. If, for example, a child is so young that she cannot be cross-examined at all, or if she is 'simply too young and too frightened to be subjected to a thorough direct or cross-examination[,]' [citation], the fact that she is physically present in the courtroom should not, in and of itself, satisfy the demands of the Clause." (*United States v. Spotted War Bonnet* (8th Cir. 1991) 933 F.2d 1471, 1474.) Consistent with this principle, various cases have held that the right to cross-examination was violated where very young witnesses appeared at trial but were essentially unable to testify at all. (See, e.g., *In re N.C.* (Penn. 2014) 105 A.3d 1199, 1200, fn. 1, 1202-1206 [four-year-old witness refused to answer prosecutor's questions about defendant, did not provide verbal answers to other questions, and eventually assumed fetal position]; *In re Brandon P.* (Ill. 2014) 10 N.E.3d 910, 913-914, 919-920 [on direct examination, four-year-old witness refused to give verbal responses or acknowledge she knew defendant; State's concession that child unavailable for cross-examination accepted].) Similarly, at least two courts have held that a child's refusal to answer most questions on cross-examination after providing some testimony on direct resulted in a violation of the Confrontation Clause. (*Commonwealth v. Kirouac* (Mass. 1989) 542 N.E.2d 270, 272-273 & fn. 4 [six-year-old witness repeatedly stated she was tired and could not remember her statements about defendant]; *United States v. Samuel M.* (D.N.M. May 3, 2013, No. CR 13-0088 JB) 2013 U.S.Dist. LEXIS 181301, at *5, 15-20, 50-51 [four-year-old witness "lost composure, shut down, and was unable to continue" after answering some questions on cross-examination].) But as in cases involving adult witnesses, a child's failure to answer some questions does not automatically establish a constitutional violation. (See, e.g., *Bugh v. Mitchell* (6th Cir.

39

2003) 329 F.3d 496, 502-505, 509 [four-year-old witness gave mostly nonverbal answers and refused to answer certain questions].)

In our view, these decisions suggest a continuum on which the right to an opportunity for effective cross-examination is more likely violated as the number of relevant questions that go unanswered increases. (See *People v. Sanders*, *supra*, 189 Cal.App.4th at p. 554.) Here, daughter refused to answer hundreds of questions, of which approximately 150 were substantive. And nothing about her lack of cooperation can be attributed to the trial court, prosecutor, or defense counsel, all of whom took laudable measures to try to make it easier for her to testify. These measures included having daughter testify by closed-circuit television, taking frequent recesses during daughter's testimony and breaking early, allowing daughter to move about, draw, and eat while testifying, and questioning daughter gently and at length on safe but irrelevant topics. The trial court and defense counsel also both encouraged the prosecutor's efforts in urging daughter to cooperate, and defense counsel tried to build rapport with daughter rather than to antagonize her. He treated her kindly, did not badger her or become confrontational, and did nothing to cause her to be reticent except to ask her questions— as he was fully entitled to do—about topics she did not want to discuss.

Despite these measures, daughter refused to respond to many questions that were crucial to testing her claims, particularly those involving her drawing and her report to the daycare provider, the forensic interview, and other possible explanations for her apparent sexual knowledge. Nor would she respond to many questions bearing on her credibility more generally, such as follow-up questions about her assertion that Giron-Chamul had defecated in her hair. We need not determine the exact line on the continuum when a child witness's refusal to answer questions impedes cross-examination enough to violate the Confrontation Clause because the line was clearly crossed here. Daughter's failure to respond to questions on critical topics deprived Giron-Chamul of " 'a full and fair opportunity to probe and expose . . . infirmities' " in her testimony and out-of-court statements (*Owens*, *supra*, 484 U.S. at p. 558), and her testimony should have been stricken.

We also conclude that the violation of Giron-Chamul's right to cross-examination was prejudicial, and the Attorney General offers no argument otherwise. Daughter was the complaining witness, and her claims were not corroborated by evidence from any independent source. Though her testimony constituted substantial evidence to support the oral-copulation count, the prosecution's case was far from overwhelming. Indeed, the jury was initially deadlocked on that count, and Giron-Chamul was acquitted of the other two charges. And while Giron-Chamul's trial counsel was able to extract some favorable statements, daughter refused to answer many other questions that bore directly on the oral-copulation count as well as her credibility more generally. It is hardly clear that the result would have been no better had "the damaging potential of the cross-examination [been] fully realized." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) As we cannot conclude the error was harmless beyond a reasonable doubt, we must reverse the conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.)

III.

DISPOSITION

The judgment is reversed.

41

_____
Humes, P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.


*People v. Giron-Chamul* (A140628)


42

Trial Court:                          Solano County Superior Court

Trial Judge:                          Honorable Ramona Garrett

Counsel for Appellant:                William P. Daley
                                      By appointment under the First District Appellate
                                      Project

Counsel for Respondent:               Kamala D. Harris
                                      Attorney General

                                      Gerald A. Engler
                                      Chief Assistant Attorney General

                                      Seth K. Schalit
                                      Supervising Deputy Attorney General

                                      John H. Deist
                                      Deputy Attorney General